ANDREW CRISPO GALLERY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Andrew Crispo Gallery v. Commissioner
Docket No. 20343-88.
United States Tax Court
T.C. Memo 1992-106; 1992 Tax Ct. Memo LEXIS 127; 63 T.C.M. (CCH) 2152; T.C.M. (RIA) 92106; February 24, 1992, Filed *127 Decision will be entered under Rule 155. Walter J. Rockier, Mary E. Cassidy, and David P. Gersch, for petitioner. Diane D. Helfgott, for respondent. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency of $ 2,559,639.13 in petitioner's Federal income tax for 1987 and additions to tax of $ 127,981.96 under section 6653(a)(1)(A), 50 percent of the interest due on $ 2,559,639.13 under section 6653(a)(1)(B), and $ 639,909.78 under section 6661(a). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Because respondent disallowed a deduction for a net operating loss carryover from 1986, issues pertaining to the redetermination of the 1987 deficiency and relating to petitioner's Federal income tax return for 1986 must be decided. After concessions, the issues remaining for decision are: (1) Whether the statutory notice of deficiency contains a valid "determination" pursuant to section 6212(a) with respect to the disallowance of the net operating loss carryover from 1986, and, *128 if so, whether the burden of going forward on the 1986 issues should be shifted to respondent, (2) whether petitioner is permitted to use the installment method to report gain from the sale of artwork in 1987, (3) whether petitioner correctly calculated its 1987 cost of goods sold, (4) whether deductible interest accrued in 1986 and 1987 on an obligation owed by petitioner, (5) whether deductible interest accrued in 1986 and 1987 on unpaid State and city taxes, (6) whether petitioner sustained a loss deductible under section 165 in 1986, (7) whether petitioner is entitled to deductions for depreciation in 1986 and 1987, (8) whether petitioner incurred and may deduct a professional fee in the amount of $ 200,763.16 in 1986, (9) whether petitioner has substantiated deductions for advertising expenses, shipping and storage, photographs and catalogues, handling charges, and messenger services for 1986 in excess of amounts previously allowed, (10) whether petitioner is liable for additions to tax for negligence pursuant to section 6653(a)(1), and (11) whether petitioner is liable for an addition to tax for substantial understatement of income tax under section 6661. FINDINGS OF FACT Some *129 of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. The Andrew Crispo Gallery, Inc. (petitioner), was a corporation that had its principal place of business in Floral Park, New York, at the time it filed its petition. Petitioner began operations in 1973 in New York, New York. Petitioner bought and sold artwork for its own account, handled items on consignment for private owners, and conducted exhibitions of artwork. From 1980 onward, Andrew Crispo (Mr. Crispo), petitioner's president, was the sole shareholder of petitioner and managed all of its affairs. In April 1984, pursuant to an investigation of petitioner for Federal income tax fraud for 1979, 1980, 1981, and 1982, the United States Department of Justice issued subpoenas for substantially all of the books and records of petitioner. Petitioner delivered these books and records to the Department of Justice. In November 1985, Mr. Crispo pleaded guilty to an information charging him with aiding and abetting corporate income tax fraud. He was imprisoned from April 1986 to July 1989. In 1986, petitioner unsuccessfully sought the return of its books and records from *130 the Department of Justice. In November 1987, petitioner hired Elliott J. Katz (Mr. Katz), a certified public accountant, to prepare its Federal income tax returns for 1983, 1984, 1985, 1986, and 1987. In 1987 and 1988, Mr. Katz and other representatives of petitioner repeatedly sought the return of petitioner's books and records from the Department of Justice. The Department of Justice returned, in a state of disarray, some of the books and records in 1987 and 1988. Many of the records, relevant to both petitioner's income tax reporting and its financial affairs in past years, were not returned, including the ledger account reflecting the cost of all of the works of art purchased over the years. Mr. Katz attempted to determine the cost of goods sold in 1987 from copies of invoices, from Mr. Crispo's recollection, and, in some cases, from the sellers of the works of art purchased by petitioner. Mr. Katz attached the following statement to petitioner's Federal income tax return for 1987: In response to a subpoena, all of taxpayer's financial records were surrendered to the U.S. Attorney's office. Taxpayer believes that not all records that were subpoenaed were returned. *131 Due to the unavailability at the time this return was prepared of certain key records such as bank statements and checks and an analysis of the taxpayer's loan account at Rosenthal & Rosenthal Schedule L, Balance Sheets is not presented and the returns may not contain items that may be in the unavailable records.
In addition to the above statement, Mr. Katz attached the following statement to petitioner's Federal income tax return for 1986: The accompanying tax return reflects sales, the dollar amounts of which were determined by the efforts of Internal Revenue Service agents and the taxpayer's representatives. Cost of sales was determined by reference to purchase invoices, where available, confirmations, and where neither were available the recollection of the taxpayer's chief operating officer.
Petitioner reported its income and deductions on its Federal income tax returns for 1986 and 1987 using the accrual method of accounting. Petitioner filed its Federal income tax returns for 1986 and 1987 on February 16, 1988. In the statutory notice of deficiency for 1987, among other things, respondent disallowed the deduction of a net operating loss carryover from 1986 *132 and stated: The amount of $ 3,139,890.00 claimed as a net operating loss carryover deduction from the taxable year ended December 31, 1986 is disallowed at this time pending completion of the examination for year 1986 currently in process to determine whether any or all of the losses claimed will be allowable.
Sales of Artwork in 1987
Between 1979 and 1983, petitioner added the following works of art to its inventory: Provincetown #3; River Bottom, Silver, Ochre, Carmine, Green; Red Space; Captain Upton's House; Maine in Fog; Man & Machinery; Composition; and Coastal Scene at Newport (the eight works of art). During the course of its business operations, petitioner borrowed money from Rosenthal and Rosenthal, Inc. (Rosenthal), and other creditors. Rosenthal lent money to petitioner on Mr. Crispo's personal guarantee and, in May 1984, secured general liens on all of petitioner's property. In March 1985, Rosenthal exercised its lien and seized the artwork owned by petitioner. In 1986, the Internal Revenue Service (the Service) assessed Federal income taxes against petitioner for 1979, 1980, 1981, and 1982. The Service placed liens on, and seized the property of, *133 petitioner, including the artwork previously seized by Rosenthal. On October 20, 1987, the Service and Sotheby's, Inc. (Sotheby's), entered into a Consignment Agreement under which certain items of petitioner's artwork were to be sold at auction. The Consignment Agreement and, to the extent not inconsistent therewith, the Conditions of Sale set forth in the Sotheby's auction catalogue governed the auctions. The Conditions of Sale provided that, on the fall of the auctioneer's hammer, title to the item being auctioned was to pass to the highest bidder, subject to the terms of the Conditions of Sale. The bidder would "thereupon (a) assume full risk and responsibility * * * [for the item] and (b) * * * pay the full purchase price therefor or such part as we may require." Sotheby's retained numerous additional rights and remedies, including cancellation, with respect to a successful bidder who failed to pay in full. Among the items sold at auction in November and December 1987 were the eight works of art. The purchasers of the eight works of art made all of the payments for them in 1988. On its Federal income tax return for 1987, petitioner reported income from the sale of the *134 eight works of art under the installment method. 1987 Cost of Goods Sold
Petitioner purchased the painting Figure in a Landscape for $ 17,000 on March 17, 1979, and later sold it to Angara Anstalt for $ 28,500. On or about June 12, 1979, petitioner sold the painting View from Capri to Angara Anstalt for $ 65,000. As part of the transaction, petitioner reacquired Figure in a Landscape and gave Angara Anstalt a credit of $ 28,500 against the $ 65,000 purchase price of View from Capri. On March 24, 1982, petitioner exchanged the painting Going Out in the Yacht, valued at $ 85,000, for the painting A Pensive Moment. The paintings Figure in a Landscape and A Pensive Moment were sold in 1987. Prior to 1987, petitioner purchased 25 pieces of furniture by Giacometti for $ 500,000. In 1987, the Service took all of these pieces to Sotheby's for consideration and appraisal. Sotheby's provided low and high estimates of the potential selling price of each piece. Sotheby's selected eight of these pieces for sale at the November and December 1987 auctions. Sotheby's sold these eight pieces for a total price of $ 333,000. In one instance, the buyer defaulted on the price of $ 45,000. *135 Six other pieces were sold in 1987 for a total of $ 133,000. Altogether, 13 pieces were disposed of in 1987 at an aggregate sales price of $ 421,000. This figure was within the range of estimates given by Sotheby's as to the potential selling prices of those pieces. The unsold pieces were of lesser quality. The sums of the Sotheby's estimated low and high selling prices of the 11 pieces for which no market price was available were $ 222,000 and $ 305,000, respectively. On its Federal income tax return for 1987, petitioner deducted $ 6,921,590.00 as its cost of goods sold. The parties have stipulated to a cost of goods sold of $ 5,376,236.67 for all of the items sold in 1987 other than the works of art and furniture identified in this section. Interest on Debt to the Baron
Petitioner and Baron H. H. Thyssen-Bornemisza (the Baron) had an ongoing business relationship that involved the purchase and sale of artwork. On August 1, 1981, petitioner contracted to sell the painting Still Life with Letter to Dennis Gale to the Baron for $ 315,000. On May 23, 1982, petitioner contracted to sell the painting Pillars of Hercules to the Baron for $ 360,000. Petitioner was required *136 to deliver these works of art to the Baron. On December 22, 1983, petitioner accepted from the Baron the sculpture Sleeping Muse on consignment. Petitioner was required to remit to the Baron the proceeds from the sale of Sleeping Muse. On December 23, 1983, petitioner sold Sleeping Muse for $ 337,500 in cash and the painting Hauling the Seine. Petitioner's basis in Hauling the Seine was $ 262,500. On February 13, 1984, petitioner notified the Baron that he had sold the sculpture Sleeping Muse for consideration of $ 600,000. In early 1984, representatives of the Baron hired Gilbert S. Edelson (Mr. Edelson), an attorney, to represent the Baron in connection with the described transactions with petitioner. As of March 1984, petitioner had not delivered Still Life with Letter to Dennis Gale, Pillars of Hercules, or the proceeds from the sale of Sleeping Muse to the Baron. On March 27, 1984, petitioner delivered various works of art to the Baron and executed a document which stated that the artwork had been delivered "as collateral to secure the payment of a debt in the amount of $ 1,275,000 owed by * * * [petitioner] to * * * [the Baron]. The terms and conditions of the payment *137 of the debt and the return of the collateral will be negotiated between the parties." From April through July 1984, Mr. Edelson sent to petitioner's representative four different proposed settlement agreements, each of which provided for the payment of petitioner's debt to the Baron and interest on the debt at a rate of at least 12 percent. On May 29, 1984, petitioner delivered to the Baron various works of art as substitutes for the artwork previously transferred to the Baron as collateral. At that time, petitioner and the Baron executed a new document that stated that the artwork had been furnished "to secure the payment of a debt in the amount of $ 1,275,000 owed by * * * [petitioner]." On September 26, 1984, petitioner delivered to the Baron the painting Pillars of Hercules and $ 100,000 in cash. This payment reduced the amount of principal debt owing from petitioner to the Baron to $ 815,000. In October 1986, John Philip Kassebaum (Mr. Kassebaum), petitioner's attorney, began representing petitioner in negotiations with Mr. Edelson. From November 3, 1986, through January 27, 1988, various proposals and counterproposals were exchanged between Mr. Edelson and Mr. Kassebaum. *138 At all times during the negotiations, it was understood and agreed that interest was accruing on petitioner's $ 815,000 debt to the Baron at a rate of 9 percent per annum or some greater amount. On or after January 27, 1988, a writing reflecting the complete agreement between the Baron and petitioner was delivered. That writing set forth the agreed rate of interest at 13 percent from June 1, 1987. On its Federal income tax returns for 1986 and 1987, petitioner deducted as interest amounts accrued on its debt to the Baron. Interest on State and City Taxes
In the Service's computation of petitioner's Federal income taxes for 1979, 1980, 1981, and 1982, an Internal Revenue agent calculated an amount due as New York State and New York City taxes for those years and permitted a deduction for them on petitioner's Federal income tax returns for those years. State and city tax deficiencies were never proposed or assessed against petitioner for 1979, 1980, 1981, and 1982. Petitioner did not prepare or file State and city tax returns reporting taxes owed and did not pay such taxes. On its Federal income tax returns for 1986 and 1987, petitioner deducted as interest amounts estimated *139 to have accrued on State and city taxes estimated for 1979, 1980, 1981, and 1982. Section 165 Deductions
Martin and Diane Ackerman (the Ackermans) managed RNB Leasing Corporation (RNB) and Sovereign American Arts Corporation (Sovereign). On October 1, 1975, petitioner transferred various works of art to RNB and received $ 119,000 (the $ 119,000 transaction). The transfers were recorded on invoices. A portion of the $ 119,000 was allocated to each work of art. The works of art, their cost to petitioner, and the allocation of the $ 119,000 among the individual works were as follows: Allocation of
Artwork
Cost to Petitioner
Purchase Price
Avenue Du Maine
$ 21,500
$ 15,000
Gladiolas, 1920,
Irises, 1919 50,000
20,000
Untitled
(Fell Plummers Wharf) 10,000
4,000
Small Point, Maine
11,000
5,000
Target Untitled
50,000
25,000
Heroic Image
(Heroic Imagination) 24,000
18,000
Calla Lily
15,000
7,000
From the Plains
48,000
25,000
In addition, RNB agreed to transfer each of the works of art back to petitioner for a price equal to that portion of the $ 119,000 allocated to the work, plus 23 percent of that amount per year or part year thereof. The *140 latter agreement was to be effective until September 30, 1976. It was subsequently renewed at various intervals in return for periodic payments at a rate equal to 26 percent of $ 119,000 per year. Subsequently, petitioner paid RNB $ 41,000, the total amount allocated to Fell Plummers Wharf; Small Point, Maine; Target Untitled; and Calla Lily. RNB returned these works of art to petitioner. Petitioner and RNB also agreed to exchange the artwork Weighing Cotton, owned by petitioner, for the works of art From the Plains and Heroic Image. The cost to petitioner of Weighing Cotton was $ 90,000. On February 21, 1978, petitioner and Mr. Crispo transferred various works of art to RNB in exchange for $ 75,000, which was paid to Mr. Crispo (the $ 75,000 transaction). The works of art transferred in the $ 75,000 transaction and their cost to petitioner or Mr. Crispo were as follows: Artwork
Cost
Sunflowers $ 18,000.00
Moon & Sea II
13,500.00
Sea Gull Motif
19,000.00
Block Island
33,500.00
Boat Fantasy --
Deer Isle, Maine #30 17,106.25
Portrait W. -- No. 1
7,500.00
Gueridon Devant la Fenetra
13,455.00
For Bandini (two panels)
35,000.00
Great American Nude No.10
28,000.00
*141 In addition, RNB agreed to transfer the works of art back to petitioner and Mr. Crispo if they paid RNB $ 83,025 at any time during a 6-month period. This latter agreement was later extended on a month-to-month basis in return for periodic payments at a rate equal to 26 percent of $ 75,000 per year. On March 11, 1981, petitioner purchased from RNB the artwork Le Magicien for $ 70,000. RNB never delivered Le Magicien to petitioner. On September 14, 1981, petitioner transferred the painting Mule's Skull with Pink Poinsettias to Sovereign and received $ 150,000 (the $ 150,000 transaction). The transfer was recorded on an invoice. In addition, Sovereign agreed to transfer the painting back to petitioner in exchange for $ 150,000, plus a monthly fee equal to 10 percent greater than the prime rate at the Chemical Bank on the 14th day of each month of $ 150,000 divided by 12. The latter agreement was to be effective for as long as the monthly payments were made. The cost to petitioner of Mule's Skull with Pink Poinsettias was $ 300,000. On October 29, 1981, petitioner transferred the painting Three Shells to Sovereign and received $ 100,000 (the $ 100,000 transaction). The transfer *142 was recorded on an invoice. In addition, Sovereign agreed to transfer Three Shells back to petitioner in exchange for $ 100,000, plus a monthly fee equal to 10 percent greater than the prime rate at the Chemical Bank on the 29th day of each month of $ 100,000 divided by 12. The latter agreement was to be effective for as long as the monthly payments were made. The cost to petitioner of Three Shells was $ 250,000. On November 23, 1981, petitioner transferred Roof and Steeple to Sovereign and received $ 25,000 (the $ 25,000 transaction). The transaction was recorded on an invoice. In addition, Sovereign agreed to transfer the artwork back to petitioner in exchange for $ 25,000, plus a monthly fee equal to 10 percent greater than the prime rate at the Chemical Bank on the 23rd day of each month of $ 25,000 divided by 12. The latter agreement was to be effective for as long as the monthly payments were made. The cost to petitioner of Roof and Steeple was $ 60,000. In or about April 1982, petitioner arranged for, and RNB consented to, the sale of Block Island to a third party for $ 400,000. RNB credited $ 78,000 of the proceeds to the amount due from petitioner to repurchase *143 the remaining artwork in the $ 119,000 transaction, consisting of Avenue du Maine; Gladiolas, 1920; Irises, 1919; and Weighing Cotton. The works of art Avenue du Maine; Gladiolas, 1920; and Irises, 1919 were retained by RNB and substituted for Block Island in the $ 75,000 transaction. The artwork Weighing Cotton was retained by RNB and substituted for Roof and Steeple in connection with the $ 25,000 transaction. On June 6, 1982, petitioner delivered to RNB the artwork Curtain with Square Stage and Floor Boards. The cost of Curtain with Square Stage and Floor Boards to petitioner was $ 24,000. RNB never returned this painting to petitioner. Petitioner made the periodic payments as required by the $ 119,000, $ 150,000, $ 100,000, and $ 25,000 transactions. Mr. Crispo made the periodic payments as required by the $ 75,000 transaction. During 1982, petitioner and Mr. Crispo ceased making periodic payments to RNB and Sovereign. On its Securities and Exchange Commission Forms 10-K filed for the fiscal years ended September 30, 1977, and September 30, 1982, Sovereign described its loan transactions. The transactions of petitioner with RNB and Sovereign conform to that description. *144 The Ackermans repeatedly referred to these transactions as loans in their correspondence with petitioner. In addition, petitioner was required to pay the insurance on, and the storage costs of, the artwork transferred to RNB and Sovereign. At or after the end of 1982, RNB sold some of the artwork referred to in the above transactions to a third party. In September 1983, petitioner and Mr. Crispo brought an action in the New York State Supreme Court against RNB, Sovereign, and the Ackermans to recover the following artwork: Avenue du Maine; Gladiolas, 1920; Irises, 1919; Small Point, Maine; Weighing Cotton; Curtain with Square Stage and Floor Boards; Portrait W. - No. 1; Sea Gull Motif; Gueridon Devant la Fenetra; For Bandini; Great American Nude No. 10; Moon and Sea II; Le Magicien; Roof and Steeple; Three Shells; and Mule's Skull with Pink Poinsettias. On October 27, 1983, the New York State Supreme Court issued a preliminary injunction prohibiting RNB, Sovereign, and the Ackermans from selling any remaining artwork they held as a result of the transactions with petitioner and Mr. Crispo. On January 16, 1985, the New York State Supreme Court dismissed the case in favor of RNB, *145 Sovereign, and the Ackermans. Petitioner and Mr. Crispo appealed the decision to the Appellate Division of the New York State Supreme Court (the Appellate Division). On May 20, 1986, the Appellate Division affirmed the decision of the New York State Supreme Court. Petitioner and Mr. Crispo moved for leave to appeal the decision of the Appellate Division to the New York State Court of Appeals, which motion was denied on October 7, 1986. A total of $ 350,000 was not repaid to RNB or Sovereign to redeem the artwork that had been transferred to them. On its Federal income tax return for 1986, petitioner deducted a loss for the works of art that were not recovered from RNB, Sovereign, and the Ackermans. Mr. Katz computed the amount of the loss as the sum of the actual or estimated acquisition costs of each painting turned over to Martin Ackerman or RNB or Sovereign. He computed petitioner's loss without regard to whether the acquisition costs claimed as a loss had been reflected in petitioner's inventories and cost of goods sold in prior years. Depreciation
On its Federal income tax returns for 1981 and 1982, petitioner claimed deductions for the depreciation of leasehold *146 improvements to the building used as petitioner's place of business and expensive furnishings therein. Petitioner vacated the building used as its place of business in 1985. On petitioner's Federal income tax returns for 1986 and 1987, Mr. Katz claimed depreciation deductions in the same amounts that had been claimed in 1981 and 1982. Professional Fee
Petitioner hired Mr. Kassebaum, an attorney, at the end of 1985 or early in 1986. Petitioner did not pay Mr. Kassebaum a retainer at that time. Although Mr. Kassebaum did not know when he would get paid, he expected that proceeds from sales of petitioner's assets could be used to pay his fee. Mr. Kassebaum engaged in various activities on behalf of petitioner, including negotiating on petitioner's behalf and preparing and reviewing documents in connection with the obligations petitioner owed to the Baron. In the spring of 1987, petitioner paid Mr. Kassebaum a part of his fee for 1986. In addition, Mr. Kassebaum was paid $ 293,083.89 out of the proceeds of the sale of artwork at the Sotheby's November and December 1987 auctions. At some unknown time, Mr. Kassebaum prepared a statement for 1986 in the total amount, including *147 disbursements, of $ 200,736.16. On its Federal income tax return for 1986, petitioner deducted $ 907,253 as professional fees, including $ 193,934 as a professional fee to Mr. Kassebaum. This amount was based on a telephonic statement by Mr. Kassebaum to Mr. Katz. Mr. Katz did not have any statement for such fees. On its Federal income tax return for 1987, petitioner deducted $ 435,500 as professional fees. 1986 Miscellaneous Expenses
During 1986, petitioner incurred expenses in connection with its business that were paid by Rosenthal and added to petitioner's loan account with Rosenthal. On its Federal income tax return for 1986, petitioner deducted expenses for advertising, shipping and storage, telephone, photographs and catalogues, handling charges, and messenger and other services. After trial of this case, respondent conceded various expense deductions, including a deduction of $ 1,900.00 for shipping expenses, $ 407.22 for telephone expenses, and $ 725.00 as payment for services to Louis Weinel. OPINION Procedural Background
This case was set for trial on February 20, 1990. At a hearing held January 10, 1990, petitioner contended that it had not been *148 given an explanation for the disallowance of the net operating loss carried over from 1986 to 1987. Petitioner sought to compel the deposition of the Internal Revenue agent who had performed the audit of petitioner's Federal income tax returns for 1986 and 1987. Respondent objected. The Court, applying Rule 75(b), refused to compel the deposition of the nonparty witness. On petitioner's motion, however, the Court granted a continuance until respondent provided petitioner with a detailed position regarding his disallowance of the deduction of the net operating loss carryover from 1986. Prior to February 22, 1990, respondent explained his position on the net operating loss carryover from 1986 at an informal meeting that included counsel for petitioner, counsel for respondent, and the Internal Revenue agent who had audited petitioner's Federal income tax returns for 1986 and 1987. Trial of the case was thereafter rescheduled for February 21, 1991. Petitioner subsequently moved for partial dismissal with respect to the disallowance of the net operating loss carryover, arguing that respondent had not made a valid "determination" of a deficiency for 1987 as required by section 6212(a). *149 By order prior to trial, the Court concluded that respondent had made a determination for 1987 based on facts relevant to petitioner for that year. Petitioner's motion was denied. Petitioner, in its brief, asks the Court to reconsider its denial of petitioner's motion for partial dismissal with respect to the net operating loss carryover from 1986. Petitioner argues that the notice of deficiency with respect to the disallowance of the deduction of the net operating loss carryover is invalid for lack of a "determination" of a deficiency for 1987. Petitioner argues that, by stating in the notice of deficiency that "pending completion of the examination for year 1986 currently in process to determine whether any or all of the losses claimed will be allowable", respondent admitted that he had not examined the facts and that, therefore, the notice of deficiency is invalid on its face. Petitioner relies on the opinion of the Court of Appeals for the Ninth Circuit in Scar v. Commissioner, 814 F.2d 1363 (9th Cir. 1987), revg. 81 T.C. 855 (1983), in support of its argument that the notice of deficiency was invalid. In Scar, however, there was *150 an express statement on the face of the notice that indicated that the taxpayers' return had not been examined and the tax had been computed using a maximum rate rather than the actual rate applicable to the taxpayers' taxable income. In addition, the notice identified an entity in which the taxpayers had no interest. In Clapp v. Commissioner, 875 F.2d 1396 (9th Cir. 1989), affg. an unreported Order of this Court, the Court of Appeals reviewed the general principles and special circumstances set forth in Scar v. Commissioner, supra, reiterated the general rule that courts will not look behind a notice of deficiency to question respondent's motives and procedures leading to a determination, and rejected the taxpayers' argument that the failure to consider certain information invalidated the notice. Clapp v. Commissioner, supra at 1400, 1402. The Court of Appeals stated that "The notices of deficiency in the record make absolutely clear that the Commissioner did examine appellants' returns, and did at least consider appellants' deductions. He merely disallowed them." Clapp v. Commissioner, supra at 1402. *151 In this case, respondent examined petitioner's Federal income tax return for 1987 prior to issuing the notice of deficiency and disallowed the deduction for the net operating loss carryover from 1986 based on that examination. Petitioner attempts to distinguish Clapp on the ground that, in that case, the taxpayers failed to provide respondent with appropriate information in their possession. That circumstance was discussed by the Court of Appeals as a factor to be taken into account with respect to alternative remedies and in comparing the facts to those found in Scar v. Commissioner, supra. The Court of Appeals' conclusion that the statutory notice was valid, however, was independent of those facts. Petitioner also calls our attention to two unpublished opinions of the Courts of Appeals, but, by their very terms, they are not to be cited as precedent. Even if published, they would not add to our analysis. Petitioner has the burden of proof in challenging respondent's determinations. Rule 142(a). Petitioner argues that, if the Court finds that the notice of deficiency is valid, the burden of going forward should be shifted to respondent with respect *152 to those issues relating to the net operating loss carryover from 1986. Petitioner bases its contention on the opinion of the Court of Appeals for the Fifth Circuit in Portillo v. Commissioner, 932 F.2d 1128 (5th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1990-68. In that case, the Court of Appeals held that a notice of deficiency is arbitrary and erroneous if respondent has no factual foundation for his proposed assessment and is relying on the presumption of correctness in his favor to support his contention. Portillo v. Commissioner, supra at 1133. In Portillo, as distinguished from this case, the Court of Appeals was dealing with a case in which respondent was claiming the taxpayer had unreported income and wherein the Court of Appeals concluded that respondent's notice of deficiency lacked any "ligaments of fact." Id. (quoting Carson v. United States, 560 F.2d 693, 696 (5th Cir. 1977)). Petitioner seeks to avoid the frequently stated rule that petitioner always bears the burden of proof as to deductions. See, e.g., New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). *153 As stated by the Court of Appeals in Gatlin v. Commissioner, 754 F.2d 921, 923-924 (11th Cir. 1985), affg. T.C. Memo. 1982-489: This is a deduction case. At all times the taxpayer must come forward with evidence to support his entitlement to the deduction and the amount of that entitlement. When claiming a deduction, the taxpayer has admitted the full amount of income but seeks to pay less than the applicable tax on that income by utilizing available deductions. Because the taxpayer is privy to the facts that substantiate a deduction, he must bear the burden of proving his right to, and amount of, a claimed deduction. This stricter burden for deduction cases makes sense because unlike unreported income cases the taxpayer is not required to prove a negative. [Citations omitted.]
Stated another way, "Whatever the proper rule may be where inclusion in income is controverted, there is no dispute that the taxpayer bears the burden of proof in substantiating claimed deductions." Rockwell v. Commissioner, 512 F.2d 882, 886 (9th Cir. 1975), affg. T.C. Memo. 1972-133. The Court of Appeals for the Ninth *154 Circuit has similarly stated that "The burden of proving a deductible loss and its amount is always upon the taxpayer. To require that the taxpayer sustain the burden of proving the fact of loss and its amount is not to require him to prove a negative". Clapp v. Commissioner, 321 F.2d 12, 14 (9th Cir. 1963), affg. 36 T.C. 905 (1961). (Citations omitted.) In Malinowski v. Commissioner, 71 T.C. 1120 (1979), the taxpayers claimed that their records had been lost by the Service. Thus they argued that respondent should bear the burden of proof. The Court stated that "the inability to produce a record which is unintentionally lost, whether by the petitioner, the Commissioner, or by a third party, alters the type of evidence which may be offered to establish a fact, but the rule does not affect the burden of proving a fact." Malinowski v. Commissioner, supra at 1125. In this case, also, we have found no reason to and decline to relieve petitioner of the normal burden. Therefore, the burden of going forward, as well as the burden of proof, with respect to all issues in the case remains with petitioner. *155 Sales of Artwork in 1987
Petitioner reported income from the sale of artwork in 1987 under the installment method of section 453(c). Section 453(a) requires a taxpayer to report income from an installment sale under the installment method. An installment sale is "a disposition of property where at least 1 payment is to be received after the close of the taxable year in which the disposition occurs." Sec. 453(b)(1). "The term 'installment sale' does not include * * * [a] disposition of personal property of a kind which is required to be included in the inventory of the taxpayer if on hand at the close of the taxable year." Sec. 453(b)(2)(B). Respondent contends that the artwork sold was inventory and that, therefore, petitioner could not properly report income from its sale under the installment method. Property is inventory if it is "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Wood v. Commissioner, 16 T.C. 213, 225-226 (1951). Petitioner originally held the artwork that was sold at the Sotheby's November and December 1987 auctions as inventory. The artwork could be characterized as investment *156 property rather than inventory only if petitioner's purpose in holding the artwork had changed at the time of its sale. Biedermann v. Commissioner, 68 T.C. 1, 11 (1977). Because petitioner's artwork was seized in March 1985 when Rosenthal exercised its lien, petitioner's intent in holding the artwork at the time of its seizure determines its character at the time of sale. Cf. Daugherty v. Commissioner, 78 T.C. 623 (1982) (holding that, when a taxpayer receives a condemnation notice, his intent in holding the condemned property automatically changes and that his intent in holding the property prior to the receipt of the notice is determinative for purposes of tax characterization of the property). Petitioner cites Riedel v. Commissioner, 261 F.2d 371 (5th Cir. 1958), revg. T.C. Memo. 1957-210; Greenspon v. Commissioner, 229 F.2d 947 (8th Cir. 1956), affg. in part and revg. in part 23 T.C. 138 (1954); Smith v. Dunn, 224 F.2d 353 (5th Cir. 1955); Dillon v. Commissioner, 213 F.2d 218 (8th Cir. 1954), revg. a Memorandum Opinion of this *157 Court dated March 30, 1953; Estate of Ferber v. Commissioner, 22 T.C. 261 (1954); and Garrett v. United States, 128 Ct. Cl. 100, 120 F. Supp. 193 (1954), for the proposition that, in cases in which someone other than the original holder of the property sells it, the property is treated as having lost its character as inventory. But, in each of those cases, the taxpayer was not the original holder of the property and did not hold the property for sale in the ordinary course of business. In this case, petitioner was the original holder of the property that was sold for petitioner's account. Petitioner also relies on Glisson v. Commissioner, T.C. Memo. 1981-379, and Lomas & Nettlecon Financial Corp. v. United States, 486 F. Supp. 652 (N.D. Tex. 1980), for the proposition that, in cases in which a taxpayer discontinues his business activity, inventory is converted to investment property. In each of these cases, the character of the property had changed because the taxpayer's purpose in holding the property had changed while the property was in the taxpayer's control. If the taxpayer does not *158 change his purpose for holding the property prior to cessation of business activity due to involuntary proceedings, then the property retains its character as inventory. See Daugherty v. Commissioner, 78 T.C. at 638-639. The character of property does not change because it is sold in an involuntary proceeding or outside the ordinary course of business. See Daugherty v. Commissioner, supra at 639; Lawrie v. Commissioner, 36 T.C. 1117, 1121 (1961). Petitioner did not change its purpose in holding the artwork that was sold at the November and December 1987 auctions prior to the time the artwork was seized in March 1985. The artwork was personal property that would have been required to be included in the inventory of petitioner if on hand at the close of the taxable year. The sale of the artwork was not an installment sale. Therefore, income from those sales may not be reported under the installment method. In its brief, petitioner argues that, even if it may not use the installment method for reporting the income from the sales of the artwork, it need not include gross receipts from the sales of the artwork in income *159 until 1988, because the sales were not completed until 1988. Respondent argues that petitioner may not be permitted to raise this theory for the first time in its brief. A party may rely upon a theory only if it provided the opposing party with fair warning that it intended to make an argument based upon that theory. Pagel, Inc. v. Commissioner, 91 T.C. 200, 211 (1988), affd. 905 F.2d 1190 (8th Cir. 1990). "Fair warning" means that the failure to give notice of the intention to raise the argument would not prejudice the party against whom the claim is being asserted in its ability to prepare its case. Pagel, Inc. v. Commissioner, supra at 211-212. The existence of prejudice is determined based on "the amount of surprise and the need for additional evidence on behalf of the party opposed to the new position." Pagel, Inc. v. Commissioner, supra at 212. An accrual method taxpayer, such as petitioner, must report income in the taxable year in which "all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy." Sec. 1.446-1(c)(1)(ii), *160 Income Tax Regs. Whether the "all events" test has been satisfied in the case of a sale of property is a factual question to be determined based on a totality of the circumstances. Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 32 (1988). Petitioner claims that the evidence presented at trial by respondent establishes that accrual did not occur until 1988. Respondent maintains that, had it been apprised of petitioner's intention to argue that the sales were not completed until 1988, respondent would have presented evidence at trial to refute the argument and prove that the sales were completed in 1987 or that no new evidence could be produced to rebut that claim. Petitioner points to various phrases in both the petition and in evidence presented at trial that may be construed as suggesting that the sales were not completed until 1988 in order to argue that its intention to rely on this theory was disclosed to respondent. Petitioner has not persuaded us that respondent had sufficient notice that petitioner intended to argue that the sales were not completed in 1987. In Pagel, Inc. v. Commissioner, supra, we held that respondent *161 was permitted to make a new argument in its brief because respondent had taken no position inconsistent with the one he was then arguing. Petitioner, by claiming installment sale treatment on its return and consistently arguing that the sales should be classified as installment sales in 1987, gave respondent no notice of its intention to argue that the sales had not been completed in 1987. Therefore, we conclude that respondent was surprised by the introduction of the argument that accrual did not occur until 1988 and that respondent could have presented additional evidence on that issue at trial if respondent had had sufficient notice. Because respondent is prejudiced, petitioner may not now argue that accrual of income did not occur until 1988. 1987 Cost of Goods Sold
Most of the issues with respect to the 1987 cost of goods sold have been resolved by stipulation of the parties. A dispute remains, however, regarding the costs to petitioner of the paintings A Pensive Moment and Figure in a Landscape and 13 pieces of Giacometti furniture. Petitioner claims that the cost to it of A Pensive Moment was $ 165,000. Mr. Crispo testified that he exchanged the painting Going *162 Out in the Yacht, to which Mr. Crispo assigned a value of $ 250,000, for $ 85,000 and A Pensive Moment. Petitioner presented no other evidence that the value of Going Out in the Yacht was $ 250,000. The other evidence presented by petitioner corroborates respondent's contention that the cost to petitioner of A Pensive Moment was $ 85,000. An invoice from petitioner, dated March 24, 1982, reflects the exchange of Going Out in the Yacht, valued at $ 85,000, for A Pensive Moment. Petitioner claims that this construction is a misreading of the invoice, but petitioner has not presented an alternative reading that would sustain its position. We conclude that the cost to petitioner of A Pensive Moment was $ 85,000. Petitioner originally acquired Figure in a Landscape in 1979 for $ 17,000. It then sold the painting to Angara Anstalt for $ 28,500. Later in 1979, petitioner sold the painting View from Capri for $ 65,000 to Angara Anstalt. In exchange, petitioner accepted Figure in a Landscape, for which petitioner gave Angara Anstalt a credit of $ 28,500, leaving a balance due of $ 36,500. Respondent contends that, because the painting Figure in a Landscape had been sold to Angara *163 Anstalt in an earlier transaction, its return to petitioner effected a rescission of the prior sale and that petitioner's basis in the painting should remain at $ 17,000. We are not persuaded. Petitioner reacquired Figure in a Landscape in an arm's-length transaction between it and Angara Anstalt. Petitioner's cost of acquiring Figure in a Landscape was $ 28,500, the credit (or value) given in the second transaction. Petitioner acquired 25 pieces of Giacometti furniture for $ 500,000. During 1987, 13 of these pieces were sold for $ 421,000. "When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts". Sec. 1.61-6(a), Income Tax Regs. The proper allocation of cost among the 25 pieces is necessary in order to determine the cost of the 13 pieces that were sold in 1987. See Texas v. United States, 263 F. Supp. 1, 6 (W.D. Texas 1967). Respondent used the Sotheby's appraisals of the 11 pieces of furniture for which market prices were unavailable as an indicator of the fair market value of those pieces -- between $ 222,000 and $ 305,000. He then added these sums to the prices *164 paid for the pieces that were sold and that upon which the buyer had defaulted, thereby computing the fair market value of all 25 pieces as between $ 688,000 and $ 771,000. The fair market value of the 13 pieces that were sold in 1987 out of the fair market value of the 25 pieces was therefore between 55 percent and 61 percent. Respondent then allocated $ 305,000, 61 percent of the $ 500,000 cost of the furniture, as the cost of goods sold for the 13 pieces sold in 1987. Respondent's allocation, like petitioner's, assigned a higher cost basis to the pieces that were sold than to those that remained. Mr. Crispo testified that the cost to petitioner of the pieces that were sold was $ 450,000 and that $ 50,000 should be allocated to the remaining pieces. He offered no supporting evidence or reason for his conclusion other than the claim that the pieces sold were of higher quality than those that remained. We conclude that petitioner has not met its burden of proof. We sustain respondent's determination that the cost of the 13 pieces sold in 1987 was $ 305,000. Interest on Debt to the Baron
On its Federal income tax returns for 1986 and 1987, petitioner deducted as interest *165 amounts that it contends accrued on a debt owed to the Baron. Respondent first contends that those amounts represented damages that were the result of breaches of contracts with the Baron and that the rules governing the accrual of damages would prohibit the claimed deductions. Section 163(a) permits a deduction for "all interest paid or accrued within the taxable year on indebtedness." Indebtedness is "an existing, unconditional, and legally enforceable obligation for the payment of a principal sum." Midkiff v. Commissioner, 96 T.C. 724, 734-735 (1991) (quoting Howlett v. Commissioner, 56 T.C. 951, 960 (1971)). The $ 815,000 owed by petitioner to the Baron resulted from petitioner's failure to deliver the artwork Still Life with Letter to Dennis Gale and $ 500,000 of consideration that petitioner had not remitted to the Baron. Documents dated March 27, 1984, and May 29, 1984, recognize a debt owed by petitioner to the Baron and describe the artwork transferred to the Baron as collateral for the payment of the debt. At all times subsequently, representatives of the Baron and representatives of petitioner treated the amounts due as a debt. *166 We conclude that throughout 1986 and 1987, petitioner owed an existing, unconditional, and legally enforceable debt of $ 815,000 to the Baron. An expense is deductible by an accrual method taxpayer if "all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." Sec. 1.461-1(a)(2), Income Tax Regs. Respondent contends that there was no fixed liability by petitioner to pay interest to the Baron until the final settlement agreement was signed in 1988 and that, therefore, interest did not accrue prior to 1988. The issue is therefore whether petitioner was liable in 1986 and 1987 for interest on its indebtedness to the Baron and, if so, at what rate. As originally executed, the documents acknowledging petitioner's debt to the Baron did not state a rate of interest to be paid, but rather that the "terms and conditions of the payment of the debt * * * will be negotiated between the parties." The lack of a formal written agreement does not mean that a liability to pay interest does not exist. See H. Harwood & Sons, Inc. v. Commissioner, 2 B.T.A. 1293 (1925) (allowing an interest deduction *167 for notes that "bore no interest on their face, but it was understood and agreed between the maker and the payee that the notes should bear interest * * * at the going rate."); sec. 1.461-3T, Q&A-12, Income Tax Regs., 50 Fed. Reg. 20755 (May 20, 1985) (stating that "Section 461(h) applies to interest accruing under any obligation (whether or not evidenced by a debt instrument)") [emphasis added]. Throughout the negotiations, the parties agreed that interest was accruing on the debt to the Baron at a rate of at least 9 percent. Even if the Baron would ultimately have excused petitioner from paying the interest on the debt, a deduction for accrued interest would nevertheless have been proper. Cohen v. Commissioner, 21 T.C. 855, 857 (1954). We conclude that petitioner is entitled to deduct interest accrued on its debt to the Baron in 1986 and 1987 at a rate of 9 percent. The final settlement agreement that was mailed to the Baron in January 1988 included an interest rate of 13 percent to run from June 1, 1987. Because the agreement was not delivered until 1988, we cannot conclude that interest at a rate of 13 percent, rather than 9 percent, *168 was sufficiently certain to be deductible as of the end of 1987. Interest on State and City Taxes
On its Federal income tax returns for 1986 and 1987, petitioner deducted as interest amounts that it contends accrued in 1986 and 1987 on State and city taxes owing for 1979, 1980, 1981, and 1982. Petitioner has not shown that it had a fixed liability to pay State and city taxes for those years and, consequently, that interest accrued on that liability. See sec. 1.461-1(a)(2), Income Tax Regs.
As a basis for determining the amount of the interest deduction, petitioner relied upon the calculations that the Internal Revenue agent had used in determining Federal income tax deductions for State and city taxes in 1979, 1980, 1981, and 1982. These calculations represent only the amounts the Service was willing to permit petitioner to deduct on its Federal income tax returns for those years. They cannot be described as a determination of the fact of or the amount of the liability for State and city taxes owed with reasonable accuracy. Respondent's disallowance of an interest deduction for State and city taxes is sustained. Section 165 Losses
Respondent contends that petitioner's *169 transactions with RNB and Sovereign (the Ackerman entities) were sales and that petitioner is therefore not entitled to deduct losses therefrom under section 165. Petitioner argues that the transactions were loans. The intention of the parties, to be determined based on all of the surrounding facts and circumstances, not only the form of the transaction, is determinative of the characterization of such transactions. United National Corp. v. Commissioner, 33 B.T.A. 790, 794 (1935). Each sale from petitioner to the Ackerman entities was accompanied by an option to repurchase at the original sales price as long as yearly or monthly option payments were made. The benefit to the Ackerman entities would arise from the option payments, rather than from any potential appreciation in the artwork. The sales prices were approximately 50 percent of the cost of the artwork. Petitioner paid the storage and insurance on the artwork sold to the Ackerman entities. Sovereign described such transactions as loans in its Securities and Exchange Commission filings. The Ackerman entities referred to the transactions as loans in correspondence with petitioner. We therefore conclude *170 that these transactions were secured loans, not sales. Petitioner argues that it is entitled to a deduction in 1986 for its basis in the works of art that were not returned to it by the Ackerman entities. Section 165(a) allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." A loss is not deductible if: there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery * * * until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. Whether or not such reimbursement will be received may be ascertained with reasonable certainty * * * by an adjudication of the claim * * *
Sec. 1.165-1(d)(2)(i), Income Tax Regs. In 1986, petitioner was denied leave to appeal its claim against the Ackerman entities and the Ackermans to the Court of Appeals of New York. In 1986, a reasonable prospect for recovery no longer existed. The loss was sustained *171 in 1986. Petitioner must also establish the amount of the loss. The amount of loss allowable as a deduction is limited to "the adjusted basis for determining the loss from the sale or other disposition of the property involved." Sec. 1.165-1(c)(1), Income Tax Regs. "The basis of property shall be the cost of such property". Sec. 1012. "Adjustments [to basis] must always be made to eliminate double deductions or their equivalent." Sec. 1.1016-6(a), Income Tax Regs. Petitioner is required to prove its adjusted basis in the artwork at the time the loss was sustained. Petitioner originally deducted the entire cost of the artwork without offsetting it by amounts received from the Ackerman entities and not repaid to them. Petitioner, in its brief, concedes that the deduction should be reduced by those amounts. Petitioner has provided the cost to it of each work of art that was lost. This evidence is insufficient, however, to show that it did not previously deduct or otherwise recover the cost of the works of art on which it is claiming a loss. Petitioner has produced no books or records that reflect its adjusted basis in the works of art lost to the Ackerman entities. Petitioner *172 has failed to meet its burden of proof and may not deduct the cost of the unrecovered works of art. Because we conclude that petitioner is not entitled to deductions for losses on these transactions, we do not address respondent's alternative contention that some of the works of art transferred to the Ackerman entities constituted a constructive dividend to Mr. Crispo and that losses resulting from the loss of those works of art are therefore not deductible. Petitioner also deducted the cost of the painting Small Point, Maine. Because it was returned by RNB to petitioner, no deduction will be allowed for this painting. With regard to the painting Le Magicien, for which petitioner paid $ 70,000 in 1981 but never received, petitioner will be allowed a deduction of $ 70,000. Depreciation
Respondent disallowed deductions for depreciation expense taken in both 1986 and 1987. Petitioner may not deduct depreciation expenses for leasehold improvements to a building that was abandoned in 1985. See sec. 167(a). Petitioner argues, however, that part of the depreciation expense deductions was taken on expensive furnishings and should therefore be allowed. Petitioner has not shown *173 that it owned and used in its business the expensive furnishings in 1986 and 1987. It has not established its basis for depreciation in those years. Petitioner challenges: Should any of petitioner's legal arguments be ruled out of [the] case as too late, petitioner maintains that the same rule must apply to respondent on this and numerous other contentions * * *. Subject to this reservation for equal treatment, petitioner will concede * * * that one-third of depreciation claimed for 1987 is disallowable.
Petitioner's suggestion ignores the burden of proof, i.e., petitioner's obligation to present evidence that it is entitled to the deductions claimed on its returns. In the statutory notice, the deductions were disallowed "for lack of substantiation as you have failed to establish that the expenses were ordinary and necessary business expenses or that the expenditures had been made for the purposes designated." Petitioner now asserts that it is surprised, for example, that it must prove that it continued to be entitled to own and use in its business items on which depreciation was claimed (or that the amounts paid to the Baron were interest). These contentions approach *174 frivolity. Respondent's arguments are based on evidence presented by petitioner at trial and do not require any new evidence by petitioner that was not necessary in the first instance. In any event, only the parties may settle issues by bargaining. The Court can only decide them on the evidence -- or the lack of it. Because petitioner has not met its burden of proof, respondent's disallowance is sustained. Professional Fee
The parties dispute the deductibility of $ 193,934.00 claimed as a professional fee to Mr. Kassebaum on petitioner's Federal income tax return for 1986. Although the return was filed in 1988, Mr. Katz did not have any written statement from Mr. Kassebaum at that time; he relied only on a telephonic communication with Mr. Kassebaum. An undated statement for $ 200,736.16 is now relied on by petitioner to support the deduction for 1986. Although Mr. Kassebaum testified, he did not explain the relationship between the amount on the statement, the amount given to Mr. Katz on the telephone, and the amounts ultimately paid. Respondent argues that petitioner has not satisfied its burden of proving the amount owed to Mr. Kassebaum as of the end of 1986; that *175 the unspecified amount paid to him in the spring of 1987 was intended to cover fees for 1986 and 1987; that as of 1986 Mr. Kassebaum was uncertain that he would be paid because of the financial situation of petitioner; and that the fee statement was not contemporaneous, does not reflect an agreement between petitioner and its counsel regarding fees for 1986, and is too "vague and uninformative" to substantiate a fee of over $ 200,000. Petitioner does not attempt to explain the uncertanties in the record, relies on the Service's approval of fees paid to Mr. Kassebaum from the sale of artwork in 1987, and characterizes respondent's arguments as "balderdash" not meriting reply. Again petitioner ignores the burden of proof. We cannot discern from the record any reliable evidence that an obligation to Mr. Kassebaum in the amount claimed existed as of the end of 1986. Although Mr. Kassebaum performed substantial services for petitioner in both years, substantial deductions for professional services were claimed in both years. Petitioner has not bothered to clarify the uncertainties and inconsistencies in the record, and it is neither respondent's burden nor ours to do so. We are not *176 persuaded that petitioner is entitled to the deduction in issue for 1986. 1986 Miscellaneous Expenses
Petitioner has presented no evidence to substantiate expenses in 1986 in excess of those previously allowed or now conceded and has not offered any explanation of them in its brief. No additional deductions may be determined. Additions to Tax for Negligence
Section 6653(a)(1) provides for additions to tax if any part of an underpayment "is due to negligence or disregard of rules or regulations". Negligence is the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). At the time petitioner's Federal income tax return for 1987 was prepared, petitioner's president, Mr. Crispo, was incarcerated. Mr. Crispo hired Mr. Katz to prepare petitioner's Federal income tax returns for 1983, 1984, 1985, 1986, and 1987. At this time, the Government was in possession of many of petitioner's books and records, which it had obtained in a previous criminal investigation. Although some of the records were returned pursuant to requests by petitioner's *177 representatives, they were returned in disarray. Mr. Katz testified that he tried to reconstruct the records, obtaining information from invoices, past tax returns, and Mr. Crispo. Mr. Katz prepared the 1987 Federal income tax return based on the information he was able to obtain. In addition, he attached notes to the 1986 and 1987 returns, describing potential infirmities with the returns, and he met with the Internal Revenue agent assigned to the audit soon after the returns were filed. Although there were errors in the tax returns, the extenuating circumstances surrounding their preparation lead us to conclude that the errors were not due to negligence. See, e.g., Hill v. Commissioner, T.C. Memo. 1976-139. Petitioner is therefore not liable for the additions to tax for negligence. Substantial Understatement of Tax
Section 6661(a) provides for an addition to tax if there is a substantial understatement of income tax for any taxable year. For a corporate taxpayer, an understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $ 10,000. Sec. 6661(b)(1). If, however, *178 the taxpayer can show that there was substantial authority for the treatment of the item on the return or the relevant facts affecting the item's tax treatment were adequately disclosed in the return or in a statement attached to the return, then the amount of the understatement is reduced by the amount attributable to such item. Sec. 6661(b)(2)(B). The purpose of section 6661 is to discourage taxpayers from playing the "audit lottery" by requiring them to disclose questionable positions taken on their returns. S. Rept. 97-494, at 272-273 (1982). Petitioner claims that it adequately disclosed the potential controversies relating to its return. The regulations provide that: Disclosure will be adequate with respect to an item * * * if it is made on a properly completed Form 8275 or if it takes the form of a statement attached to the return that includes the following: (i) A caption identifying the statement as disclosure under section 6661. (ii) An identification of the item (or group of similar items) with respect to which disclosure is made. (iii) The amount of the item (or group of similar items). (iv) The facts affecting the tax treatment of the item * * * that reasonably *179 may be expected to apprise the Internal Revenue Service of the nature of the potential controversy concerning the tax treatment of the item (or items).
Sec. 1.6661-4(b)(i), Income Tax Regs.
In addition, "the requirements of adequate disclosure on the return can nonetheless be satisfied by providing on the return sufficient information to enable respondent to identify the potential controversy involved." Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987) (citing S. Rept. 97-494, at 274 (1982)). Petitioner's attachments to its Federal income tax returns for 1986 and 1987 can be described as invitations to audit petitioner's returns. They put the Service on notice of potential controversies throughout the returns. Each deduction now in dispute was set out on the return. Petitioner adequately disclosed the potential controversies in its return and is therefore not liable for the addition to tax under section 6661. To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155.