## PHIPPS et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 56.

Circuit Court of Appeals, Second Circuit.

Dec. 7, 1931.

Bernhard Knollenberg, of New York City, for petitioners.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key, John H. McEvers, C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and J. E. Marshall, Sp. Atty., Bureau of Internal Revenue, all of Washington, D. C., for respondent.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The taxpayers, who were two brothers and a sister, purchased a tract of land in 1916 at Palm Beach, Fla. They took the title in the name of an agent Robbins, had the tract surveyed, cleared, plotted into about

seventy lots, ornamented with trees, and furnished with roads, water, sewers, and electric light. Soon after the lots were plotted, a price was fixed at which they might be sold at a profit and sales were made through brokers, which continued for some years. Profits of $42,367.74 were realized from these sales in 1924, and of $41,948.35 in 1925. Robbins, the only witness before the Board of Tax Appeals, testified that the taxpayer, Mrs. Guest, purchased no other Florida land except a plot which she bought in 1915 and on which she built a cottage for her own residence. The two brothers each acquired other land at Palm Beach on which they built residences and likewise together purchased two other tracts. One of them was known as the Ocean Park tract, of which they sold the ocean front and were keeping the remainder. The other tract was called the Red Tree lots, which they were still keeping. They did not improve either of these tracts as they had the seventy lots first mentioned.

Robbins was asked when testifying whether the three taxpayers purchased any real estate in the United States other than the seventy lots which they held in common. He replied: "I do not know whether these individuals did. I am quite sure that they did, but I could not give specific instances because they were always investing in real estate both individually and collectively." Fol. 205. He was later asked what was the extent of the activities of these taxpayers in buying and selling or otherwise dealing in real estate during the years 1915 to 1925, inclusive, all over the United States. To this he replied: "They were very intermittent. I think they as individuals bought very little property, compared to the property that some of their corporations purchased in Florida and elsewhere, they having bought these properties that I have mentioned, and sold some and improved some with their homes, they bought very little after that. They bought some, but not every year, and not every two years. It was whenever they felt that they got a bargain in real estate there, or a broker would come to them and try to sell them a tract of land, and sometimes succeeded in doing so, sold the brothers a tract." Fols. 256, 257.

The Commissioner held that the taxpayers were real estate dealers, that profits from the sale of the Florida lands did not constitute capital gain within the meaning of the Revenue Acts and that they were accordingly not entitled to compute these profits at 12½ per centum. He therefore assessed an additional tax based upon the ordinary income tax rates. The Board of Tax Appeals affirmed the Commissioner, and made findings that the taxpayers "were dealers as well as investors in real estate" (fol. 146), and "that the property was purchased, and at all times held primarily for sale in the course of their business" (fol. 149).

The question presented is whether the income derived from the sales of land at Palm Beach in 1924 and 1925 was taxable as "capital net gain" under the provisions of section 208 (b) of the Revenue Act of 1924 (26 USCA § 939 note), or whether it was taxable as a gain derived from the sale of property "held by the taxpayer primarily for sale in the course of his trade or business." If the first, the taxpayers were entitled to compute the tax upon the profits derived from the sale of the Palm Beach lots at 12½ per centum, seeing that they had been held for more than two years and thus came within 208 (a) (8) of the Revenue Act (26 USCA § 939 note).

After the seventy lots in question were once improved for sale in 1916, nothing remained to be done except to receive such offers as might come in through brokers at Palm Beach. Robbins, who was the private secretary of John S. Phipps, was most of the time in New York where his regular place of business was, and, because he held the legal title, contracts and deeds were sent to him there for signature. No sales office seems to have been maintained at Palm Beach, and Robbins had nothing to do with procuring purchasers of the lots. The contracts of sale which were forwarded to him in New York by the local brokers who found purchasers would usually be accompanied by checks which he would indorse and have credited to the account of the property on the books of the Bessemer Investment Company, a Phipps family corporation that financed the enterprise. It is evident that after 1916 neither the owners, nor Robbins, had anything to do with these lots except to attend to the payment of taxes and take in such moneys as might come in from sales they made through brokers.

If it be argued that the sales of these lots when taken with the purchases and sales of other land we have mentioned were sufficient to amount to a business in real estate, the answer is that any real estate transactions which occurred in 1924 and 1925 were too limited to amount to a business in real estate. The evidence is that after the

taxpayers bought the Florida tracts we have mentioned "they bought very little." "They bought some, but not every year, and not every two years." The lots sold in 1924 and 1925 had been held for more than two years so that the taxpayers were entitled to compute their taxes at 12½ per centum on the net gain from the sales unless the property was held "primarily for sale in the course of * * * trade or business." The difficulty with regarding the transactions in Florida lands as a trade or business is great. While the purchases were made with the hope of profitable sales at some future time they do not seem to have been sufficiently frequent, or the activities sufficiently engrossing, to give the taxpayers the vocation of real estate dealers or operators in 1924 or 1925.

Prior to 1924 more than 76 per centum of the total value of the Palm Beach tract of seventy odd lots had been sold. The real estate transactions of the taxpayers during 1924 and 1925 apparently consisted only in selling the remainder of the Palm Beach tract which had then been held for seven or eight years and in holding a few other lots for opportune offers. No purchases during these years are shown and if, because the taxpayers had the burden of proving a negative, we should assume that purchases may have been made, then, the testimony is that all purchases subsequent to 1916 were few. The statement of Robbins that the taxpayers were "always investing in real estate" cannot fairly be taken to mean that they were continually trading as individuals or joint adventurers. It undoubtedly referred to all the real estate activities of the Phipps family, both through their corporations and individually, and should be interpreted in connection with Robbins' explicit statement that the purchases were intermittent and that sometimes there would be lapses of a year or two years without any at all.

Persons with large incomes of course invest their surplus funds in something, and if, to diversify their holdings, they buy land, with the expectation of selling it when a good price is offered, such an expectation cannot, in our opinion, convert some sales of land that had been held for seven or eight years into a trade or business in real estate. There should be a greater continuity and larger absorption of time in such transactions to make the taxpayers more than investors. A fair reading of the record makes it clear that nothing was done during the years in question but to hold land

for sale which had been previously purchased, and to accept such offers from purchasers as were presented by brokers and seemed satisfactory. There was during the years in question no activity amounting to a trade or business within the meaning of the statute, and whether there was such a trade or business depended on the situation of the taxpayers at the time of the sale. They had not continuously engaged in the development and sale, or the purchase and sale of lands. Mente v. Eisner (C. C. A.) 266 F. 161, 11 A. L. R. 496; Cadwalader v. Lederer (C. C. A.) 274 F. 753, 18 A. L. R. 411; Bedell v. Commissioner (C. C. A.) 30 F.(2d) 622; Rogers v. United States (Ct. Cl.) 41 F.(2d) 865; Washburn v. Commissioner (C. C. A.) 51 F.(2d) 949; Heiner v. Tindle, 276 U. S. 582, 48 S. Ct. 326, 72 L. Ed. 714.

It cannot be held that the taxpayers' supervision of their own investments was a "trade" or "business," for such a construction of the statute providing for a tax of 12½ per centum on capital net gain would defeat it altogether.

The decision of the Board of Tax Appeals is modified so as to reduce the deficiencies for the years 1924 and 1925 in accordance with the views expressed in this opinion.