**CHICAGO TITLE & TRUST CO. v. UNITED STATES.**

No. 50 C 1796.

United States District Court, N. D. Illinois, E. D.

March 25, 1953.

Kixmiller, Baar & Morris, Chicago, Ill., for plaintiff.

Otto Kerner, Jr., U. S. Atty., and John Looby, Jr., Asst. U. S. Atty., Chicago, Ill., Ellis N. Slack, Act. Asst. Atty. Gen., and Andrew D. Sharpe, Leon F. Cooper, Spec. Assts. to Atty. Gen., for defendant.

PERRY, District Judge.

This a suit by the executors of the Last Will of Leon Sigman, deceased, for the recovery of alleged overpayment of income tax during his lifetime. The sum of $26,-184.81 is claimed as a refund for income tax paid by the taxpayer during the year 1943 and the sum of $27,894.13 for the year 1946, together with interest from the time the respective amounts were paid toward payment of income tax. For the year 1943 taxpayer, Leon Sigman, paid to the Collector of Internal Revenue of the United States a total income tax in the amount of $27,333.-02 for which he seeks a refund in the amount of $26,184.81. For the year 1946, he paid a total income tax in the amount of $36,225.26, for which he seeks a refund of $27,894.33.

For the purpose of convenience, Leon Sigman, is hereinafter referred to as the taxpayer. The facts are very simple. The taxpayer was a man of considerable means, whose principal business was that of President and Executive Officer of the Scotch Woolen Mills in Chicago, Illinois, from whom he received a salary of $43,500 for the years involved herein and a similarly substantial salary for many years prior thereto. In 1942 his gross rentals amounted to $188,387.41; in 1943 to $189,593.28; in 1944 to $207,517.13; in 1945 to $197,263.18 and in 1946 to $207,566.59. He hired professional real estate firms to service and manage his properties. While it is true that no sale was made without his approval, it is perfectly apparent from the evidence that selling was an inconsequential part of his work for the reason that over a period of many years only three of the properties that brought rental value were sold and they were not properties which brought in the major part of the income for rental. The rental received from the three buildings involved together was less than one-half of the rental from the Scotch Woolen Mills Building and less than one-fourth of the income from the Bay State Building, which were the two buildings which taxpayer continued to hold until his death.

From 1927 to 1946 the taxpayer made no purchase of real estate. During that period of time he sold four parcels, three of which created the losses that brought about this controversy. The fourth one was an apartment house in Miami Beach, Florida, containing six apartments, two of which taxpayer and his family occupied and four of which were rented. That property was sold for $16,414.17 less than adjusted cost. The evidence does not reveal whether there was a loss. Since part of the premises was used as residence, the element of depreciation was apparently a factor. Anyway, no loss is claimed so far as the record reveals. That sale occurred back in 1930. The record reveals that the taxpayer had a joint interest in some Florida lands which was disposed of but no mention of any price is made.

Taxpayer owned only three other properties and he retained ownership in them until his death. One property seemed to be of little value, namely, some Wisconsin lands in which he invested the amount of $4,584.-32. The other two properties were rental properties from which he continued to draw very substantial rentals to the date of his death. They were the Bay State Building at Randolph Street and State Street in Chicago and the Scotch Woolen Mills property at Halsted and Adams, which he rented to the Scotch Woolen Mills Company, of which company, he was President and from whom he received an annual salary of $43,-500 for the period in question.

These are five separate and distinct properties. When taxpayer sold each of these properties he sold a separate asset and terminated business so far as that particular piece of property was concerned. Since he had held these properties for many years, he was entitled to treat each of them as a "capital loss." In 1944 the taxpayer sold the property described in evidence before the Court as "Cascade Building" and sustained a "capital loss" of $77,499.29. The taxpayer recognized that to be the fact and so treated it when he filed his 1944 income tax return and paid accordingly, as hereinabove set forth.

In 1945 taxpayer sold two parcels of real estate which are referred to in the evidence before the Court as the "Wilson Avenue Property" and the "Roosevelt Road Property". The taxpayer sustained a loss of $238,973.43 on the "Wilson Avenue Property" and a loss of $95,241.93 on the "Roosevelt Road Property" making a grand total of $334,315.36 for the year 1944.

Meanwhile he has filed a claim for refund and amended his income tax return for the year 1944. In this claim and amended tax return he treated the loss of $77,499.29 on the sale of the Cascade Building as a "net operating loss" on the theory that the facts presented in the claim showed taxpayer Leon Sigman to be regularly engaged in the real estate business and that the loss occurred from the sale of assets consisting of the Cascade Building was therefore a "net operating loss" for the purpose of his income tax return for the year 1944.

It appears from the evidence that in 1943 the taxpayer had a long term capital gain in the amount of $26,487.14 from the sale of securities in the amount of $190,879.56. In 1944 there was only a total of $4,207.56 received in interest and dividends and $1,253.14 in interest on bonds or bank deposits. In 1946 the total dividends listed $910 and total interest $9,674.41.

In arriving at the 1945 income tax net income for the figure of $83,425.31, taxpayer credited himself with a loss of $238,973.43 as a loss from the sale of the Wilson Avenue property and a loss of $95,241.93 on the sale of the Roosevelt Road property or a to-

tal loss of $334,315.36, all of which was treated as "net operating loss." By adding these figures they were taken as operating loss to the income tax net income of the taxpayer for the year 1945, the total would be $417,740.67. In that year the record reveals a salary of $43,500 from the Scotch Woolen Mills, $125 from Directors Meeting and $154,130.78 from interest and dividends. The source of this income does not appear from the evidence. In addition taxpayer's return for 1945 shows $195,263.18 income from rentals. By treating $334,315.36 as a net operating loss the taxpayer arrived at a loss for the year 1945 in the amount of $281,181.09 and therefore paid no income tax for that year.

The taxpayer was granted a refund in the sum of $26,705.05 that he paid on his 1944 income tax on account of a claim wherein the taxpayer maintained that the loss from the sale of the "Cascade Building" was a loss upon the sale of property used in the trade or business of renting property. The Commissioner allowed that claim and made the refund on that theory. However, it is interesting to note that the greater part of the loss was sustained from the decrease in the value of the land itself rather than the building. This was not taken into consideration by the taxpayer or the Commissioner.

A table showing income tax net income of taxpayer and taxes paid from 1942 to 1946 inclusive is as follows:

| Year | Income Tax Net Income | Income Tax Paid |
|------|-----------------------|-----------------|
| 1942 | $ 77,723.86 | $ 6,230.25 |
| 1943 | $100,271.21 | $27,333.02 |
| 1944 | $ 89,571.69 | None |
| 1945 | $ 83,425.31 | $ 9,569.10 |
| 1946 | $115,869.16 | $35,347.49 |
| | $466,861.22 | $78,479.86 |

In other words, the taxpayer had a total income tax net income amounting to $466,861.22 for the five years involved and paid a tax of only $78,479.86 by virtue of treating the sales of the three buildings in 1944 and 1945 as net operating expense instead of long term capital loss, which in fact they were. If the taxpayer should be granted

his claim for refund of $26,184.84 under Count I, and the claim for refund in Count II of $27,894.13 totalling $54,078.97 and deducting that amount for the amount of his total income tax of $78,479.86, taxpayer would be paying a tax of only $24,400.89. However, that is not the end of the story. If the taxpayer's claim is granted, he will be granted six (6%) per cent interest for several years on the two respective sums. Consequently, a large portion of the sum of $24,000.89 would be consumed by the interest leaving the taxpayer paying only a nominal tax.

At this point it is important to consider whether taxpayer was really buying the buildings for investment purposes or had in mind buying property and holding it for the increased value. In the case of the Cascade Building which was bought in 1927 for $146,584.55 and sold in 1944 for $30,000. The depreciation allowed on the building during that time was $39,085.26. The record does not reveal a division in the values between land and building, but it is clear that it was the land value which the taxpayer had in mind. That is further supported by the comparatively low income from the building.

The Roosevelt Road property was revalued by the Internal Revenue Department in 1939 and the sum of $134,486.08 was fixed as the value for tax purposes. That was divided as to value as follows:

| Land Value | Building Value | Total |
|---|---|---|
| $89,657.39 | $44,828.69 | $134,486.08 |

Depreciation after 1939 and before sale was $12,801.43, deducted from $44,828.69 leaves the value of the building at $32,027.76. This property was sold for $26,500.

The Wilson Avenue property was bought in 1924 for $400,000 and the value was divided as follows:

| Land Value | Building Value | Total |
|---|---|---|
| $250,000.00 | $150,000.00 | $400,000.00 |

Depreciation before the sale amounted to $95,361.48, leaving $54,638.52 remaining against the value of the building. This property was sold for $72,000.

Here again in these two instances, it is clear that it was the value of the land that taxpayer had in mind at the time of purchase and expected a rise in the value rather than income that the taxpayer expected from the buildings. That is supported also by the low rate of income as compared with the two buildings he retained until his death and from which the principal source of income was always derived.

It just happened that the change in times and change in plans in Chicago or the delay of plans of development in Chicago did not warrant his purchasing these three sites. Taxpayer very shrewdly took his depreciation over a number of years and now his executors seek to treat him as having engaged in the real estate business for the purpose of treating these losses as net operating expenses instead of long term capital losses.

The taxpayer's own personal income tax returns from the 1942 to 1946 reveals that at no time did he hold himself out as being in the real estate business or in any business except that of custom tailor, executive, President and Treasurer of the Scotch Woolen Mills. These statements appear in varying forms under the signature of taxpayer when he was called upon to state his occupation on page one of each of those returns as indicated. His occupation during those years is as follows:

Leon Sigman

| | |
|---|---|
| 1942 | President and Treasurer Scotch Woolen Mills |
| | 742 West Adams Street |
| 1943 | Custom Tailor and Executive |
| | 5454 South Shore Drive |
| 1944 | Leon Sigman |
| 1945 | Executive |
| 1946 | Executive |

The income tax return filed by the taxpayer for 1945, reported a net loss of $126,712.36 for the year, treating the losses sustained in the sales of the Roosevelt Road and Wilson Avenue properties as deductible in full and not as "capital losses", and no tax due. The return also reported the receipt of income from rents, salaries and div-

idends and allowable deductions (other than losses on sales of the above-mentioned properties), disclosing a net income for 1945, in the amount of $208,957.47 (as adjusted by the Commissioner, the adjustments not being in dispute herein). The difference between the amount of the above-mentioned losses upon the sales of the two properties in 1945 (as adjusted), $334,215.36, and the amount of the net income of the taxpayer for that year (exclusive of the above-referred to losses on sales of real estate) $208,957.47, is $125,257.89, which is the taxpayer's "net loss" for the year 1945. It is this "net loss" for the year 1945, that the plaintiffs in the present action contend is allowable as "net operating loss carry-back" and "carry-over" deductions from the taxpayer's income for the years 1943 and 1946. The same contention was made in a claim for refund for the year 1946, which was disallowed by the Commissioner of Internal Revenue.

If the "net losses" of the taxpayer for the years 1944 and 1945, resulting from the losses sustained upon the sales of real estate in those years, hereinbefore mentioned, are allowed as "net operating loss" "carry-back" and "carry-over" deductions from his income in the years 1942, 1943 and 1946, the result would be overpayments of the taxpayer's income taxes for the year 1943, in the amount of $26,364.83, and for the year 1946, in the amount of $28,111.48.

Sections 23(s) and 122 of the Internal Revenue Code, 26 U.S.C.A. §§ 23(s), 122, infra, added to the Code by Section 211 of the Revenue Act of 1939, c. 247, 53 Stat. 862, permit two year carry-back and carry-over deductions of a "net operating loss".

Section 122(a) defines a net operating loss as "the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d)." Paragraph (5) of subsection (d) provides that:

"Deductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall (in the case of a taxpayer other than a corporation) be allowed only to the extent of the amount of the gross income not derived from such trade or business. * * *"

The question presented is whether the losses sustained by the taxpayer, in 1944 and 1945, upon the sales of the three hereinbefore mentioned properties are attributable to the operation of a trade or business regularly carried on by him within the meaning of Section 122(d) (5). If they are not, they did not result in net operating losses and the plaintiffs' complaint should be dismissed.

■ In the opinion of this Court, any allowance of a net loss carry-back or carry-over from one taxable year to another is a departure from the law concerning annual tax accounting periods, Sections 23(s) and 122 of the Internal Revenue Code, and must be strictly construed. Even under a liberal construction the carry-back and carry-over deductions could not be allowed to taxpayer because of either of his claims in the instant case. Security Flour Mills Co. v. Commissioner, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725; Heiner v. Mellon, 304 U.S. 271, 58 S. Ct. 926, 82 L.Ed. 1337; Smart v. Commissioner, 2 Cir., 152 F.2d 333, 335, certiorari denied 327 U.S. 804, 66 S.Ct. 962, 90 L.Ed. 1028.

■ This Court knows of no cases where the losses sustained upon the sale or other disposition of business assets are attributable to the operation of a business regularly carried on. Lazier v. United States, 8 Cir., 170 F.2d 521; Pettit v. Commissioner, 5 Cir., 175 F.2d 195; Sic v. Commissioner, 8 Cir., 177 F.2d 469; Baruch v. Commissioner, 2 Cir., 178 F.2d 402; Smith v. United States, 6 Cir., 180 F.2d 357, affirming D. C.W.D.Tenn., 85 F.Supp. 838; Foreman v. Harrison, D.C.N.D.Ill., 79 F.Supp. 987.

The case at bar bears strong similarity to the case of Slack v. Commissioner, 35 B.T. A. 271, taxpayer's appeal dismissed, 9 Cir., 91 F.2d 1011, where the taxpayer, who was a farmer, sold some of his farm land. There the Board of Tax Appeals, in disallowing the net operating loss deduction, said, 35 B.T.A. at pages 277–278:

"It is not enough, however, under the statute, that property be held primarily for sale. It must be held for sale in the course of the taxpayer's

trade or business. Phipps v. Commistioner, 2 Cir., 54 F.2d 469. In the instant case it may be said that the decedent was engaged in the business of owning and renting real estate, and when a piece of property was no longer valuable for that purpose it was disposed of, but the facts do not show that the decedent was engaged in buying and selling real estate as a business and we have found as a fact that he was not so engaged."

■ The relief afforded by the net operating loss carry-over was designed to benefit a taxpayer whose business was subject to "wide fluctuations in earnings" from year to year. H.Rep. No. 855, 76th Cong., 1st Sess., p. 9 (1939-2 Cum.Bull. 504, 510-511). In construing the first net operating loss provision comparable to that now contained in the Code, Section 206, Revenue Act of 1924, c. 234, 43 Stat. 253, 26 U.S.C.A. Int.Rev.Acts, page 10, the Court of Appeals for the Second Circuit, in Dalton v. Bowers, 56 F.2d 16, 18, affirmed 287 U.S. 404, 53 S.Ct. 205, 77 L.Ed. 389, stated:

"Congress intended to give relief to persons engaged in an established business for losses incurred during a year of depression in order to equalize taxation in the two succeeding and more profitable years. It was not intended to apply to occasional or isolated losses. Congress had made this distinction."

See also Burnet v. Clark, 287 U.S. 410, 53 S.Ct. 207, 77 L.Ed. 397; Holmes v. Commissioner, 2 Cir., 99 F.2d 822, certiorari denied 306 U.S. 655, 59 S.Ct. 644, 83 L.Ed. 1053; Anderson v. United States, 5 Cir., 48 F.2d 201, 202.

■ In the instant case, the taxpayer acquired real estate, including the three parcels that are involved here, for rental and investment purposes. Not a single purchase of real estate was made during the twenty-year period beginning in 1927 and ending in 1946. During that same period of 20 years, he made only four sales, one in 1930 (of property that is not involved in this case), one in 1944, and two in 1945 (which are the three sales in controversy). Even if he had made a few isolated purchases with the ultimate expectation of sale, should that be profitable, in the future, a loss resulting therefrom would be subject to the limitations and restrictions of Section 122(d) (5). In this respect, the comments of the Court of Appeals for the Second Circuit, in Phipps v. Commissioner, 2 Cir., 54 F.2d 469, at page 471, are appropriate, where the court stated in connection with business losses:

"While the purchases were made with the hope of profitable sales at some future time they do not seem to have been sufficiently frequent, or the activities sufficiently engrossing, to give the taxpayers the vocation of real estate dealers or operators * * *.

* * * * * *

"Persons with large incomes of course invest their surplus funds in something, and if, to diversify their holdings, they buy land, with the expectation of selling it when a good price is offered, such an expectation cannot, in our opinion convert some sales of land that had been held for seven or eight years into a trade or business in real estate. There should be a greater continuity and larger absorption of time in such transactions to make the taxpayers more than investors."

In the case at bar, certainly there was no frequency of sales (four), and no purchases at all during the twenty-year period ending with the close of the year 1946, the later of the two taxable years for which refund of income taxes is sought by the plaintiffs.

The taxpayer was not in the business of buying and selling real estate. He did not hold himself out as a real estate dealer in the accepted sense of the term. He maintained no office engaged in the buying and selling of real estate. He did not advertise properties for sale. His interest in real estate was the production of profitable rental income. The actual management and operation of the real estate he owned was in charge of professional real estate operators, under supervision of the taxpayer. The most that, doubtfully, may be said is that he was in the business of renting property for profit. Surely, he was

not in the business of buying and selling properties.

If the taxpayer was engaged in the business of renting real estate for profit, the sales in 1944 and 1945, upon which he sustained the losses that give rise to the controversy in this case, were sale of the physical properties used in the conduct of the business. The losses sustained, therefore, were not sustained in the operation of the business, but upon the liquidation of properties used in the conduct of the business. The losses sustained by the taxpayer upon the sales of the three parcels of real estate in 1944 and 1945 were not losses sustained in the operation of the business of renting real estate for profit any more than the loss upon the sale of a building by the owner who also conducted a department store therein would be a loss sustained in the business of operating the department store. In Lazier v. United States, 8 Cir., 170 F.2d 521, 526, the court said:

"we think that the language used by Congress, the apparent purpose of the statute, and the qualification of 'net operating loss,' as defined in § 122(a), by the limitations provided in subsection (d), of which subsection (d) (5) was one, justified the Commissioner of Internal Revenue in adopting the construction which the taxpayer challenges.

" * * * One reasonably may believe that in providing for the carrying forward and carrying back of 'net operating losses,' Congress was concerned with 'net operating losses' sustained in the normal operation of a business regularly carried on by a taxpayer and was not concerned with losses attributable to the total or partial liquidation of the physical properties used in the conduct of the business. See Mertens, Law of Federal Income Taxation, Vol. 5 page 318, § 29.05."

In Foreman v. Harrison, D.C., 79 F. Supp. 987, 988, this Court (Judge LaBuy), in June 1948, held that a taxpayer who was not engaged in the business of selling land and buildings could not carry back a loss sustained from the sale of his factory building and land as a deduction from the net operating profit of his manufacturing business. The Court said:

"1. In applying Section 122 of the Internal Revenue Code, as effective in 1941 to 1943, a net operating loss to be available for carry-over or carry-back purposes must be one sustained as an incident to the ordinary and normal course of a trade or business regularly carried on by the taxpayer.

"2. The interpretation of the Commissioner is that an isolated transaction involving the sale of building and land, formerly necessary incidents to an operating business, cannot be included within the statutory section allowing net loss carry-over or carry-back for the reason that such sale for the purpose of terminating the manufacturing activity cannot reasonably be construed to come within the category of a transaction incurred in the ordinary and normal course of a trade or business regularly carried on by the taxpayer. This interpretation is consistent with the language and intent of the statutory section.

"3. The plaintiff not being in the business of selling land and buildings cannot carry-back his loss sustained in 1943 and charge the same against the net operating profit derived in 1941."

In Smith v. United States, D.C.W.D. Tenn., 85 F.Supp. 838, at page 840, affirmed, per curiam, 6 Cir., 180 F.2d 357, the District Court found as a fact:

"XIII. With respect to the Deming Arms property the only business the taxpayer engaged in from the date of its acquisition until the date of its sale, in the year 1941, was that of operation and management for the production of rental income and the taxpayer's business with respect to the loss sustained on this property was that of managing and operating income producing real estate. Her loss during 1941 resulted from the sale of an asset previously used in the business of managing and operating income producing property and the sale of same marked the termination of that activity.

Immediately following the sale of the Deming Arms Apartments taxpayer's rental income on other holdings was reduced to a nominal figure."

and the Court stated in its conclusions of law, 85 F.Supp. at page 840:

"III. The loss arising from the sale of the Deming Arms Apartments by the plaintiff in 1941, was not a loss arising from the operation of a trade or business regularly carried on by the plaintiff taxpayer. A 'trade or business' is that which occupies the time, attention and labor of a person for the purpose of a livelihood or profit.

"IV. The loss arising from the sale of the Deming Arms Apartments by the plaintiff in 1941, was not deductible as a net operating loss deduction pursuant to Sections 122 and 23 (s) of the Internal Revenue Code, and such loss cannot be carried over to the years 1942 and 1943."

Since the taxpayer in the present case was not engaged in the business of buying and selling real estate, the losses sustained upon the properties sold in 1944 and 1945 were not attributable to the operation of a trade or business regularly carried on by him and, therefore, the net losses for the years 1944 and 1945 are not allowable as "net operating loss" deductions from his 1942, 1943 and 1946 income.

The Court, therefore, concludes that the plaintiffs' complaint should be dismissed. Findings of Fact and Conclusions of Law and judgment is entered simultaneously herewith.

The statute of limitation has run and the Department of Internal Revenue could not make a claim against the taxpayer's estate on account of the amended 1944 and 1945 income tax returns of the taxpayer. The Bureau of Internal Revenue is not now bound by the findings to the effect that taxpayer was engaged in business upon which theory said income tax returns were found and certainly this Court is not bound by any such findings. It is the opinion of this Court that such findings were not founded in substantial evidence but that the evidence on the contrary shows the taxpayer was not engaged in the real estate business. But even if such findings should stand, the claim should be disallowed for the reasons hereinabove set forth.

Other cases considered by the Court include, I. T. 3711, 1945 Cum.Bull. 162; Pinchot v. Commissioner, 2 Cir., 113 F.2d 718; Fackler v. Commissioner, 6 Cir., 133 F.2d 509.

The defendant is ordered to submit to the Court findings of fact, conclusions of law and proposed judgment in accordance with this opinion within twenty (20) days and plaintiff is given ten (10) days thereafter to submit written objections thereto.