ANDREW CRISPO GALLERY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Andrew Crispo Gallery v. Commissioner
Docket No. 20343-88
United States Tax Court
T.C. Memo 1994-563; 1994 Tax Ct. Memo LEXIS 571; 68 T.C.M. (CCH) 1187; November 8, 1994, Filed *571 Decision will be entered under Rule 155. For petitioner: Walter James Rockler, Mary E. Cassidy, and David P. Gersch. For respondent: Diane D. Helfgott. COHEN
COHEN
SUPPLEMENTAL MEMORANDUM OPINION COHEN, Judge: This case is before the Court pursuant to remand by the Court of Appeals for the Second Circuit in Andrew Crispo Gallery, Inc. v. Commissioner, 16 F.3d 1336 (2d Cir. 1994), affg. in part, vacating and remanding in part T.C. Memo. 1992-106. The remand ordered further proceedings with respect to two issues, i.e., losses arising out of transactions with the Ackerman entities and profits on sales conducted through Sotheby's, Inc. (Sotheby's), auction house in 1987. Unless otherwise indicated, all references to Rules are to the Tax Court Rules of Practice and Procedure. Ackerman Transaction Losses
In our prior opinion, T.C. Memo. 1992-106, we held that certain transactions that were entered into between Andrew Crispo Gallery, Inc. (petitioner), and the Ackermans were loans, even though the transactions were recorded in the form of sales. Thus, we agreed with petitioner that it would *572 be entitled to deduct losses incurred by reason of the failure of the Ackerman entities to return certain artwork to petitioner. We held, however, that petitioner had failed to prove that it did not previously deduct or otherwise recover the cost of the works of art on which it was claiming a loss. In reaching our holding, we cited the general rule that the amount of loss allowable as a deduction is limited to the adjusted basis. Sec. 1.165-1(c)(1), Income Tax Regs. In recording the transfer of artwork to the Ackermans as sales, in the normal course, petitioner would have treated the cost of the artwork as cost of goods sold. There was no evidence at trial that the normal procedure in this instance had not been followed, i.e, that the cost of the artwork was not offset against the sale price when transfer to the Ackermans was recorded as a sale. Our reference to basis without adequate explanation apparently misled the Court of Appeals, which commented that the basis of the artwork normally would have been cost. See Andrew Crispo Gallery, Inc. v. Commissioner, 16 F.3d at 1342. The Court of Appeals went on to discuss petitioner's claims that some *573 of its records had been lost by the Government. The Court of Appeals was concerned about adjustments necessary to petitioner's burden of proof, suggesting that "the Tax Court apparently would make no adjustment in such circumstances". Id. at 1343. The Court of Appeals thus remanded with instructions to us "to state with some specificity the deductions and recoveries of costs which the Gallery must negate or quantify by further proof before the Tax Court will accept the Gallery's proofs of loss in the Ackerman transactions." Id. at 1344. Pursuant to the remand, we set this case for further trial. Prior to the further trial, the parties resolved the issue of the Ackerman losses by agreement. Thus, there is no occasion for us to address further problems with petitioner's proof or to render an advisory opinion as to the manner in which a taxpayer may discharge the burden of proof when the Government loses the taxpayer's records. We note, however, that, in Malinowski v. Commissioner, 71 T.C. 1120, 1125 (1979), cited in T.C. Memo. 1992-106, we indicated that the *574 inability to produce records that were unintentionally lost "alters the type of evidence which may be offered to establish a fact". Id. at 1125. We recognize that alternative evidence may be acceptable, but the type of evidence depends on the issue and circumstances in each individual case. In this case, the anticipated alternative evidence was testimony from petitioner's accountant and return preparer about his practice in general in treating costs of goods sold when transactions were recorded as sales and the treatment of the Ackerman transactions in particular. Installment Sales Treatment
For convenience, we incorporate in haec verba from the opinion of the Court of Appeals the facts relevant to the installment sale issue in this case: In 1984, Crispo Gallery was the subject of a federal investigation for tax fraud spanning the years 1979 to 1982, and substantially all of its records were subpoenaed by the government. In 1985, Andrew Crispo pled guilty to an information charging him with aiding and abetting corporate income tax fraud. He was incarcerated from April 1986 until July 1989. * * * In March 1985, one of Crispo Gallery's principal creditors, Rosenthal *575 and Rosenthal, exercised a lien and seized all artwork owned by the Gallery. In 1986, the Internal Revenue Service seized all of the Gallery's property, including the artwork in the hands of Rosenthal and Rosenthal. In November and December 1987, Sotheby's, Inc. sold some of the seized artwork at auction pursuant to a Consignment Agreement with the IRS. The purchasers of the artwork paid for it in 1988. * * * The Gallery * * * reported [on its 1987 tax return] its gross profits from the Sotheby's sales as $ 2,092,675, but deferred recognition of all but $ 74,260 of that amount until the 1988 taxable year by classifying the transactions as installment sales under Internal Revenue Code section 453. * * * The notice * * * [of deficiency] denied the deferred recognition of the asserted installment sales income, thereby adding $ 3,154,240 to the gross receipts for the 1987 taxable year. [Andrew Crispo Gallery, Inc. v. Commissioner, 16 F.3d at 1339.]
Based on the testimony of Andrew Crispo (Crispo) at the further trial that was conducted pursuant to the remand, we find the following: Supplemental Findings of Fact
Petitioner first opened *576 a gallery under the name Andrew Crispo Gallery in 1973. The gallery was one of the major galleries in New York City in terms of location, space, the number and importance of its exhibitions, and gross sales. Crispo was a sophisticated art dealer, and his expertise as a salesman enhanced the merits and values of various pieces of artwork. The reputation of the gallery also played a role in the successful conduct of the business. The gallery reached a peak of business activity from 1978 through 1981. During its peak period, the gallery had a total of 12 employees, full and part time. Between 1979 and 1983, the gallery had gross sales ranging from $ 6 million to $ 10 million per year. In 1984 and 1985, gross sales approximated $ 543,880 and $ 2,984,408, respectively. When he was incarcerated in 1986, Crispo obtained the assistance of counsel to help him liquidate the inventory of the gallery. During 1986 and 1987, counsel, with the cooperation of the Internal Revenue Service (IRS), attempted to engage in private sales of the artwork to generate funds to reduce the liability. When these attempts failed, on October 20, 1987, an agreement was reached between Sotheby's, the IRS, *577 and Rosenthal and Rosenthal, Inc. (Rosenthal), for the consignment of certain of petitioner's inventory to be sold at auction. Crispo recognized the necessity of selling the artwork owned by the gallery to pay its tax liabilities and other debts, but he did not believe that sale of petitioner's artwork at auction was in the interest of the gallery. The gallery had never voluntarily sold at auction before, because it would have had no control over the results and because there was no personal satisfaction in selling through an auction. Sales by the gallery had primarily been to a client base of about 300 to 400 retail clients and dealers. By the time of the auction, Crispo was concerned that the impact to the gallery's reputation from his widely publicized criminal problems, combined with a bulk sale of the assets, would be the equivalent of a distress sale at minimal prices. The Consignment Agreement under which the sales were conducted stated that Sotheby's agreed to act as the agent of the IRS for purposes of offering the property of the gallery for sale at public auction. The Consignment Agreement and, to the extent not inconsistent therewith, the Conditions of Sale set forth *578 in Sotheby's auction catalogue governed the auctions. The Consignment Agreement provided that Sotheby's would remit to the IRS the net sale proceeds from each auction 35 days after the last session of the auction. The Conditions of Sale provided that, on the fall of the auctioneer's hammer, title to the item being auctioned was to pass to the highest bidder, subject to the terms of the Conditions of Sale. The bidder would "thereupon (a) assume full risk and responsibility * * * [for the item], and (b) * * * pay the full purchase price therefor or such part as we may require." The buyer was responsible not only for payment of the purchase price but also for the removal of the purchased lot within 10 business days following the sale. If the property was not so removed, and other arrangements had not been agreed upon, Sotheby's had the option of sending the property to a warehouse at the buyer's expense and risk. In addition to the warehouse fees, the buyer was liable for handling charges for each month that the property was retained. Sotheby's was not obligated to pack or otherwise handle purchased lots for its customers who did not make their own arrangements, and such services *579 were considered purely a discretionary courtesy to its clients. Sotheby's was not responsible for acts or omissions occurring during packing or shipment. If the buyer did not perform under the contract, Sotheby's had the right to enforce the sale and hold the buyer liable for the total purchase price. If the buyer had previously established credit or had made payment arrangements, the buyer would be permitted to take delivery of the purchase prior to full payment. After the auction, representatives of Sotheby's and the IRS discussed the fact that certain buyers had not yet made their payments, and therefore the proceeds of those sales would not be included in the 35th day settlement remittance. Sotheby's and the IRS agreed that these buyers would be given additional time to make their payments, on a 30-day or 30-60-90-day basis. The purchasers of the artwork at issue herein made all of their payments in 1988. Discussion
Petitioner argues that, at the time of the auction, the artwork that was sold by Sotheby's was no longer held by the taxpayer primarily for sale to customers in the ordinary course of business. In the alternative, petitioner argues that the sales were *580 not completed until 1988. The latter argument was not considered in our prior opinion, because it was not raised in a timely fashion. At the trial pursuant to the remand, however, evidence on that issue was presented, and the issue was briefed. With respect to the classification of the inventory at the date of the auction sale, we held, in our prior opinion, that petitioner did not change its purpose in holding the artwork that was sold in the auction prior to the time that the artwork was seized in March 1985. In T.C. Memo. 1992-106, we stated: "The character of property does not change because it is sold in an involuntary proceeding or outside the ordinary course of business", citing Daugherty v. Commissioner, 78 T.C. 623, 639 (1982), and Lawrie v. Commissioner, 36 T.C. 1117, 1121 (1961). The Court of Appeals reversed on this issue, holding that the character of the gallery's property as inventory must be determined as of the time it was sold. The Court of Appeals stated: In making this determination, the Tax Court is not bound by the Gallery's original motivation or intent in purchasing the paintings, see *581 Arkansas Best Corp. v. Commissioner, 485 U.S. 212, 223, 108 S.Ct. 971, 978, 99 L.Ed.2d 183 (1988); Azar Nut Co. v. Commissioner, 931 F.2d 314, 318 (5th Cir. 1991), since a taxpayer's intent is subject to change. See Glisson v. Commissioner, 42 T.C.M. (CCH) 470, 477, 1981 WL 10681 (1981) [T.C. Memo. 1981-379]. Thus, although Crispo Gallery was the nominal owner of the paintings at the time the auctioneer's hammer was poised to fall, it does not follow necessarily that it was "holding" the paintings primarily, or principally, for sale to customers in the ordinary course of its business at that time or during the two previous years when the paintings were in the possession of either Rosenthal or the IRS and the Gallery was not selling paintings. Because the issue whether the Gallery was "holding" the paintings in the prescribed manner is substantially a question of fact, we remand to the Tax Court for findings on this issue and a decision concerning alleged installment sales based upon those findings. [Andrew Crispo Gallery, Inc. v. Commissioner, 16 F.3d at 1346.] *582 The parties dispute the meaning of the Court of Appeals language. Petitioner contends that: The Gallery was faced with a change after 1985 -- putting it out of business in 1986 and 1987 -- under drastic circumstances. That the change did not reflect the Gallery's voluntary choice has no significance here. In the year 1987 the Gallery had no employees and it had no place of business. It owned no property other than the property seized and held by Rosenthal and the IRS. Its dominant officer, stockholder and selling agent, who provided the expertise for the Gallery, as Commissioner's counsel suggested in cross-examination * * *, was incarcerated in 1987. The notion that an auction sale directed by the IRS was the sale of property held for sale by the Gallery in the ordinary course of the Gallery's trade or business is simply not tenable.
Petitioner relies on a series of cases involving a "drastic change of circumstances" such as death or disability of the taxpayer who previously held property as inventory. Morse v. United States, 178 Ct. Cl. 405, 371 F.2d 474 (1967); Garrett v. United States, 128 Ct. Cl. 100, 120 F. Supp. 193 (1954); *583 Greenspon v. Commissioner, 229 F.2d 947 (8th Cir. 1956); Dillon v. Commissioner, 213 F.2d 218 (8th Cir. 1954); Estate of Ferber v. Commissioner, 22 T.C. 261 (1954); Peck v. Commissioner, 19 B.T.A. 345 (1930); Glisson v. Commissioner, T.C. Memo. 1981-379; Planned Communities, Inc. v. Commissioner, T.C. Memo. 1980-555; Scottwood Dev. Co. v. Commissioner, T.C. Memo. 1967-175; Lomas & Nettlecon Fin. Corp. v. United States, 486 F. Supp. 652 (N.D. Tex. 1980). Petitioner states: The case of W. F. Glisson v. Commissioner, 42 T.C.M. (CCH) 470 (1981) [T.C. Memo. 1981-379], cited by the Court of Appeals, still comes closer to the facts and issue of the present case than any other case that we have been able to find, and demonstrates that property originally inventory may lose that character although continuing to be held by the original holder. * * * This Court's previous distinction of those cases on the basis that *584 in those cases the change of purpose occurred while the taxpayer had control of the property, citing the Daugherty case, is not applicable in light of the Court of Appeals opinion and the cases cited above. A drastic change resulting from circumstances not under control of the taxpayer may, as it has here, force a change in the purpose for which its property is held by a third party. Mr. Crispo's testimony on intent conforms to the actual situation of the Gallery and is credible.
Respondent's position is: In both Biedermann v. Commissioner, 68 T.C. 1 (1977), and Glisson v. Commissioner, T.C. Memo. 1981-379, two of the cases cited by the Second Circuit, the court found, based on evidence in the record, that although the taxpayer had originally purchased the property at issue as inventory, the taxpayer's purpose for holding the property had changed. The taxpayer had abandoned the original business venture with respect to the property, and passively held the property over a long period of time prior to the sale. In Glisson the property had been held for 14 years, and in Biedermann, for 10 years, *585 without any attempt in either case to sell the property in question. Although in Biedermann, the taxpayer had been prohibited from using the property as originally contemplated, he was not prohibited from selling the property after this determination was made. Rather, he chose not to do so. In Glisson, the taxpayer had elected to abandon his original business venture, but chose not to offer the property for sale over a significant time period.
Respondent cites additional cases for the proposition that an intention to hold property for a substantial period of time before sale or discontinuance of active use of the property prior to sale does not change the character of the property. Margolis v. Commissioner, 337 F.2d 1001 (9th Cir. 1964), affg. in part and revg. in part T.C. Memo. 1962-86; Stockton Harbor Indus. Co. v. Commissioner, 216 F.2d 638 (9th Cir. 1954), affg. a Memorandum Opinion of this Court; Estate of Webb v. Commissioner, 30 T.C. 1202 (1958); Kruse v. Commissioner, 29 T.C. 463 (1957). The Court of Appeals *586 specifically directed us to consider whether petitioner was "'holding' the paintings in the prescribed manner", with emphasis on "holding". 16 F.3d at 1346. As respondent points out, the concept of "holding" property deals with ownership, not possession. McFeely v. Commissioner, 296 U.S. 102 (1935); Howell v. Commissioner, 140 F.2d 765 (5th Cir. 1944), affg. a Memorandum Opinion of this Court; Wyman v. Commissioner, 33 T.C. 622 (1959). To the extent that sale of the property was conducted contrary to the intent of petitioner, petitioner's ownership rights and petitioner's intent were subordinated to the lienholders' rights and the lienholders' intent to liquidate petitioner's inventory. Nonetheless, petitioner still "held" the property for tax purposes. We have previously held that assets held for sale to customers in the ordinary course of business do not become capital assets because of an intent on the part of the taxpayer to liquidate. Grace Bros., Inc. v. Commissioner, 10 T.C. 158 (1948), affd. 173 F.2d 170 (9th Cir. 1949); *587 see Tollis v. Commissioner, T.C. Memo. 1993-63. A decision to dispose of inventory "in bulk" does not change the manner in which the assets constituting the inventory are held by the taxpayer. Lawrie v. Commissioner, 36 T.C. 1117, 1121 (1961). In Estate of Ferber v. Commissioner, 22 T.C. 261 (1954), however, we held that the general rule did not apply to sale by a deceased furrier's estate of property that was inventory in the hands of the decedent. In that case, the executors engaged in auction and bulk sale of furs after the store that was operated by the decedent was sold. The Court held that, at the time of the sale, the furs were capital assets of the estate. We are not persuaded that the gallery, through Crispo as its principal, ever abandoned its intention to sell the property in the ordinary course of business. Efforts to sell by means other than the auction had continued even after Crispo's incarceration. We cannot find here that petitioner's intent had been changed by extraneous events so as to convert the artwork from inventory to some other class of property at the time *588 of the auction sales. Petitioner continued to hold the artwork as inventory and was not entitled to installment sale treatment. As a result of our holding, we must address petitioner's alternative argument that the sale of paintings pursuant to the auction did not occur until January 1988, when payments were made. Considering all of the facts and circumstances, and notably the conditions of the auction, we cannot conclude that the sales were not complete and income on them did not accrue until 1988. Both parties rely on Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 32 (1988), in which we stated: At what point in time a sale takes place is to be determined from the totality of the circumstances. While no single factor is controlling, passage of title is perhaps the most significant factor to be considered, although the transfer of possession is also significant. Commissioner v. Segall, 114 F.2d 706, 709-710 (6th Cir. 1940), cert. denied 313 U.S. 562 (1941). The objective is to determine at what point in time the seller acquired an unconditional right to receive payment under the contract. *589 Lucas v. North Texas Lumber, 281 U.S. 11, 13 (1930).
Petitioner contends that the auction was merely an executory contract for sale. The documents presented in support of this argument, however, do not support that characterization. The only obligation of the purchasers that was deferred to 1988 was the obligation to make payment; the seller acquired the unconditional right to receive payment at the fall of the auctioneer's hammer. Petitioner's alternative argument, considered on the merits, must fail. To reflect the agreement of the parties with respect to the losses on the Ackerman transactions, Decision will be entered under Rule 155.