**ANDREW CRISPO GALLERY, INC., Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**No. 668, Docket 95–4064.**

United States Court of Appeals, Second Circuit.

Argued Feb. 26, 1996.

Decided June 13, 1996.

Walter J. Rockler, Washington, D.C. (Richard J. Wertheimer, Julius M. Greisman, Arnold & Porter, Washington, D.C., of counsel), for Petitioner–Appellant.

Kenneth W. Rosenberg, U.S. Department of Justice, Tax Division, Washington, D.C. (Loretta C. Argrett, Assistant Attorney General, Gary R. Allen, Gilbert S. Rothenberg, U.S. Department of Justice, Tax Division, Washington, D.C. Washington, D.C., of counsel), for Respondent–Appellee.

Before VAN GRAAFEILAND, MESKILL and WINTER, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Andrew Crispo Gallery, Inc. ("the Gallery") appeals from a decision of the United States Tax Court (Cohen, J.) holding that the Gallery was not entitled to use the installment method of reporting income to defer recognition of profits derived from a sale of paintings seized and sold at auction by the Internal Revenue Service ("IRS"). This is the second time the Gallery has been before us seeking relief from adverse decisions of

the Tax Court. *See* 16 F.3d 1336 (2d Cir. 1994).

In addition to the installment reporting dispute at issue herein, the first appeal involved the Gallery's claimed deductions for the loss or theft of works of art it had loaned to a third party. *Id.* at 1341–44. The Tax Court refused to allow the deductions because, it said, the Gallery was unable to establish the "adjusted basis" of the cost of the works of art that were lost. *Id.* at 1342. On appeal, we expressed "considerable uncertainty" as to what the Tax Court had in mind when it referred to "the deduction or recovery of the cost of the paintings and the adjusted basis presumably resulting therefrom." *Id.*

Upon remand, the Tax Court, demonstrating the somewhat free-wheeling interpretation of the record that it exhibited throughout the proceedings, discussed what the procedure would have been had the loan been a sale. 68 T.C.M. 1187, 1188, 1994 WL 615617 (1994). The Tax Court then said that its "reference to basis without adequate explanation apparently misled the Court of Appeals, which commented that the basis of the artwork normally would have been cost." *Id.* To set the record straight, the Court of Appeals was not "misled"; it was uncertain. Moreover, it did not state that "the basis of the artwork normally would have been cost."

Upon the remand that we ordered, the parties did what they should have done before the case reached this Court. They resolved the issue of "adjusted basis" by agreement, thus reducing substantially the amount of the Gallery's alleged tax deficiency. We turn, therefore, to the issue of installment sales.

Because the incidents surrounding the seizure and sale of the Gallery's artwork were discussed in our prior opinion, 16 F.3d at 1340, 1345–46, we will recount only certain salient facts. A proper starting point is the depiction of the Gallery's structure and the nature of its operations. Although at one time the Gallery had as many as twelve full or part-time employees, it was essentially a one-man operation. Andrew Crispo, its president and sole owner, managed all of its

affairs. *Id.* at 1338. He also conducted its purchases and sales of artwork. *Id.* at 1342. As the Tax Court recognized, Andrew Crispo was a "sophisticated art dealer" whose "expertise as a salesman enhanced the merits and values of various pieces of artwork." 68 T.C.M. at 1188. Because the business of the Gallery was the purchase and sale of works of art, its fortunes rose and fell with those of its president, whose name the corporation bore. Beginning in the early 1980's, the fortunes of both went downhill together. The Gallery was forced to borrow substantial sums at exorbitant rates and secured its borrowings by liens on its artwork. As Crispo described his business, he "became overextended and it just fell apart."

In March 1985, Rosenthal and Rosenthal ("Rosenthal"), the Gallery's largest creditor, exercised its lien and seized the Gallery's artwork. In November 1985, Crispo pled guilty to tax fraud and was incarcerated from April 1986 until July 1989 in a federal prison located near Middletown, New York. In 1986, the IRS seized the Gallery's artwork, including that which was in Rosenthal's possession. As we stated in our prior opinion, 16 F.3d at 1345:

> During 1987, the Gallery had no place of business, no employees, and no artwork for sale. In short, for all practical purposes, there was no ongoing Gallery business.

Moreover, according to Crispo's undisputed testimony, that condition had existed since 1986:

Q In 1986, where were the premises of the gallery located?

A The gallery didn't exist in 1986.

Q Did it have any location at all?

A No, no.

Q In 1986 did the gallery have any employees?

A No.

Q Where were you located during that year?

A I was incarcerated.

Q In 1986 was the gallery selling paintings to customers in the ordinary course?

A No.

In its first opinion, the Tax Court held that the Gallery's intent in holding the artwork in March 1985, when it was seized by Rosenthal, determined its character as capital goods or inventory as of the time of sale. 63 T.C.M. 2152, 2159, 1992 WL 31221 (1992). In vacating and remanding, we held that the character of the property as inventory *vel non* had to be determined as of the time it was sold. 16 F.3d at 1346. The sale took place twenty-one months after Rosenthal exercised its lien, during all of which time the Gallery's artwork was in the possession of either Rosenthal or the IRS. This 21–month hiatus apparently caused the Tax Court little or no concern. Although in its first opinion, the Tax Court fastened upon Rosenthal's seizure of the Gallery's artwork as the appropriate time for determining whether the Gallery was making sales to its customers in the ordinary course of business, the Court, without any ado, shifted its focus in the second opinion to the date of the public auction which followed two seizures and a levy. Stating that "the concept of 'holding' property deals with ownership, not possession," 68 T.C.M. at 1191, the Tax Court held that at the time the artwork was sold at public auction, the Gallery still "held" the property for tax purposes. *Id.*

In so holding, the Tax Court overemphasized the commonality of the terms "held" and "owned." The legal definition of "inventory," i.e., property "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," does not end with the word "held." "A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph." *Restatement (Second) of Contracts* § 202, Illus. (d) at 88. Undue emphasis should not be placed on a single phrase. *Castellano v. State of New York,* 43 N.Y.2d 909, 915, 403 N.Y.S.2d 724, 374 N.E.2d 618 (1978) (Brietel, C.J., dissenting). Where possible, effect must be given to every word. *United States v. Bernier,* 954 F.2d 818, 819–20 (2d Cir.1992), *cert. denied,* 508 U.S. 941, 113 S.Ct. 2417, 124 L.Ed.2d 640 (1993). Thus, property does not become inventory simply because it is "held." It must be held (1) primarily for sale to customers

and (2) for sale in the ordinary course of the holder's trade or business.

■ It would be a complete distortion of both the facts and the law to hold that during the twenty-one months that preceded the tax sale the Gallery was holding the auctioned artwork primarily for sale to its customers. Indeed, to the extent that the Gallery could be said to be holding the artwork, it was doing so because the liens and the levy left it with no effective alternative. "A 'levy' is defined in 26 U.S.C. § 6331(b) as 'the power of distraint and seizure by any means'—a definition which connotes compulsion." *Interfirst Bank Dallas, N.A. v. United States,* 769 F.2d 299, 304 (5th Cir.1985), *cert. denied,* 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 716 (1986).

The artwork was subject to over $11 million in liens, the burden of which would accompany every sale. No valid sale could be made without the release of both the IRS and Rosenthal liens. The Tax Court's statement at 68 T.C.M. at 1189 that, when Crispo was incarcerated, he "obtained the assistance of counsel to help him liquidate the inventory of the gallery" is not an accurate statement of the testimony of the lawyer in question. Actually, the lawyer was asked to attempt to retrieve the voluminous records that the United States Attorney's office had subpoenaed for use in the criminal case and never returned.

We also deem it desirable to correct any false impression the reader might get from the Tax Court's statement at *id.* that during 1986 and 1987 Crispo's counsel, in an attempt to generate funds to reduce the Gallery's tax liability, engaged in private sales with the cooperation of the IRS until October 20, 1987, when the contract for the public auction was signed. The sales in question were for only a "period of time" and, as might have been expected of sales made without the expert assistance of the incarcerated Crispo, they failed to "generate any large amounts of income" and were discontinued.

Clearly, the sales did not take place in the ordinary course of the Gallery's business. There was "no activity amounting to a trade or business within the meaning of the statute." *Phipps v. Commissioner,* 54 F.2d 469, 471 (2d Cir.1931); *see Conforte v. United States,* 979 F.2d 1375, 1377 (9th Cir.1992). Crispo, the sole owner, art expert, and salesman, was in an upstate prison facing a seven-year sentence. The Gallery's artwork had been levied upon and seized by the IRS. The Gallery no longer had any employees or place of business. The expressed belief of the Tax Court Judge that the Sotheby auction of the Gallery's artwork "was a sale on behalf of the taxpayer" was wrong, both factually and legally. IRS counsel testified that the Service's decisions with respect to the sale were made in the interest of the IRS and that any benefit to the Gallery would be incidental. *See* 26 U.S.C. § 6335(e)(1)(A)(ii). Moreover, the sales were made without the benefit of Crispo's expertise as an art expert. When Crispo was asked about his reaction to what he considered a "distress sale," he expressed a concern that people would price their bids accordingly. He said:

> Yes I mean I personally felt comfortable about the pictures being of quality, but I can't dictate what other people will think about the pictures, and I certainly, as a salesman, I certainly could on an individual basis enhance the merits and the value of a picture when I am talking to a client.

> But I was 60 miles away behind bars and there was no way I had any control. I could not go up to the podium and say to each individual client this is a great Hopper or this is a great Georgia O'Keefe.

> I had absolutely no control and no say.

As stated above, the Tax Court found that Crispo was a sophisticated art dealer whose expertise as a salesperson enhanced the merits and values of various pieces of artwork. It is undisputed that none of the sales that followed the IRS levy and Crispo's incarceration utilized Crispo's expertise and salemanship. Simply put, the sales were not made in the ordinary course of the Gallery's business. The following colloquy between the Tax court and Gallery counsel illustrates once again how the Tax Court lost its focus on this issue.

> THE COURT: Well, let me ask you. If it wasn't inventory, what was it?

> MR. ROCKLER: Collateral held by the IRS for the satisfaction of a judgment,

foreclosure property. It certainly wasn't held by the Gallery for sale to customers in the ordinary course.

THE COURT: All right.

MR. ROCKLER: It rather plainly was collateral held by the government. It wasn't held by the taxpayer.

THE COURT: Well, but it was the taxpayer who was taxable on the sale of the property. The question is what type of tax would be—

The issue with respect to the auction is not who was taxable on its proceeds; it is whether the tax auction was part of the ordinary course of the Gallery's business. It was not. Indeed, it is undisputed that the Gallery never sold any of its artwork at auction.

■ Turning now to the standard of review, we start with the general proposition that findings of fact are binding unless clearly erroneous. *See, e.g., Harriss v. Commissioner,* 143 F.2d 279, 281 (2d Cir.1944). However, there is a long line of cases setting forth limitations or exceptions to this rule. Thus, findings based upon an "improper standard" (*United States v. Singer Mfg. Co.,* 374 U.S. 174, 195 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963)), "a mistaken impression of applicable legal principles" (*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982)), or "a misunderstanding of the governing rule of law" (*Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984)) may be corrected as a matter of law. *See also Frank Lyon Co. v. United States,* 435 U.S. 561, 581 n. 16, 98 S.Ct. 1291, 1302 n. 16, 55 L.Ed.2d 550 (1978); *Jacobson v. Commissioner,* 915 F.2d 832, 837 (2d Cir.1990); *Brown Daltas & Assocs., Inc. v. General Accident Ins. Co. of Am.,* 48 F.3d 30, 36 (1st Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 83, 133 L.Ed.2d 41 (1995); *Matter of Hygrade Envelope Corp.,* 366 F.2d 584, 588 (2d Cir.1966); *Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 584 F.2d 1195, 1200 n. 3 (2d Cir.1978).

Although we believe that the above exceptions are applicable in the instant case, we need not rely upon them alone. We hold that the Tax Court's decision, which that court itself described as a "holding" is clearly erroneous and cannot stand. 68 T.C.M. at 1191. During the period at issue herein, the Gallery was not holding its artwork for sale to customers in the ordinary course of its trade or business. The sale of the artwork by the IRS was not a sale of inventory.

In view of the above holding, we need not consider the interesting question of whether title to the auctioned artwork passed when the auctioneer's hammer fell or when certificates of sale were delivered to the purchasers, which, under federal regulations, supposedly does not occur until payment in full of the purchase price. *See* 26 C.F.R. § § 301.6335–1, 6, 7; 301.6338–1(a); 301.6339–1(a)(2).

Our decision herein moots in effect the Tax Court's denial of the Gallery's belated request to amend its petition to add a claim for carry back to 1987 of losses from subsequent tax years. We will not attempt to foreordain the disposition of another modified amendment request should it be made.

We vacate the decision of the Tax Court and remand to that Court with instructions to compute the Gallery's tax at issue herein in accordance with this decision.